## In re CIGNA CORP. SECURITIES LITIGATION.

Civil Action No. 02–8088.

United States District Court, E.D. Pennsylvania.

Aug. 18, 2006.

339

Carole A. Broderick, Berger & Montague, P.C., Philadelphia, PA, for Pennsylvania State Employees Retirement System.

Alexander R. Sussman, David M. Morris, Fried Frank Harris Shriver & Jacobson LLP, New York City, John G. Harkins, Jr., Harkins Cunningham, Philadelphia, PA, for Cigna Corp., H. Edward Hanway and James G. Stewart.

Robert L. Ebby, Hangley Aronchick Segal and Pudlin, Philadelphia, PA, for Hewitt Associates LLC.

## MEMORANDUM REGARDING ECONOMIC LOSS

BAYLSON, District Judge.

Defendants in this class action securities fraud case assert that the Lead Plaintiff, Pennsylvania Employees Retirement System ("SERS") will be unable to prove economic loss and loss causation, and have filed a Motion for Summary Judgment seeking to dismiss SERS's claims on that ground. In a nutshell, the facts show that SERS purchased, through investment advisors, large quantities of CIGNA common stock both before and during the alleged class damage period[1] (November 1, 2001 to October 24, 2002, inclusive), but also sold larger quantities of CIGNA stock, as the price was rising, during the damage period. Overall, comparing all CIGNA stock owned by SERS at the beginning of the class period and the sales made during the class period to the diminution in value which CIGNA stock suffered as a result of the decline in price as of the end of the damage period, SERS gained more than it lost. Thus, in purely economic terms and from a cumulative point of view, SERS did not suffer a loss on its investment in CIGNA stock. Defendants ask the Court to accept this simple concept and rule, as a matter of law, that SERS must be dismissed as a plaintiff in this case because it cannot recover damages.

---

1. The "damage period" or "class period" in a securities fraud case is generally the period of time during which plaintiffs allege that the stock price of the defendant corporation was inflated due to fraudulent statements made by company management, and ends when corrective statements are made (usually accompanied by a drop in price). The importance of this concept is discussed below.

The Court finds that, in the absence of an authoritative appellate precedent supporting Defendants position, existing principles of law for calculating damages in securities cases, as well as the fundamental Seventh Amendment constitutional right to have a jury determine damages, foreclose the possibility of summary judgment. However, because Defendants' contentions are grounded in a theory which a jury might find persuasive, the Court's ruling is without prejudice to further exploration of the parties' contentions at trial.

## I. Background

This case has a long and complicated background which need not be repeated here. *See In re Cigna Securities Litigation,* 2005 WL 3536212 (E.D.Pa. Dec. 23, 2005). The Court will, however, briefly review the procedural history leading to the instant motion.

On July 29, 2005, SERS filed a Motion to Amend its Complaint and, on August 12, 2005, Defendants filed a Cross–Motion to Dismiss all of SERS's claims for lack of economic loss and loss causation, based primarily on the recent United States Supreme Court decision in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Following argument, the Court issued an Order on November 23, 2005 in which it: (1) allowed the Complaint to be amended to add paragraphs 247–250, which assert allegations under the category of "loss causation"; (2) agreed to consider the pending Defendants' Motion to Dismiss as a motion under F.R. Civ. P. 12(b)(6) to dismiss paragraphs 247–250; and (3) allowed the parties to file additional briefing on the issue of loss causation.

Concerning the Motion to Dismiss, Defendants acknowledged that, comparing specific CIGNA stock trades by SERS, there were some instances in which SERS sold some shares at prices lower than the price at which it bought the same shares. Defendants contended, however, that on an overall or cumulative basis—*i.e.,* for all transactions during the damage period— SERS did not have a net loss in its trading in CIGNA stock, and thus, under *Dura Pharmaceuticals,* SERS could not sufficiently plead economic loss and loss causation. Stated slightly differently, Defendants asserted that, as a matter of common sense and realistic economic impact, the Court must look at the Lead Plaintiff's overall economic standing as of the end of the class period, rather than at particular, isolated individual transactions that occurred during the class period, to determine if there is a demonstrated economic loss.

*Dura Pharmaceuticals* specifically held that the fundamental requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(b) ("PSLRA"), included pleading "*economic loss,* 15 U.S.C. § 78u–4(b)(4); and '*loss causation,*' *i.e.,* a causal connection between the material misrepresentation and the loss." 125 S.Ct. at 1631 (emphasis in original). The Supreme Court held an inflated purchase price "will not itself constitute or proximately cause the relevant economic loss," and explained that "any logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Id.* at 1631.

After noting that there were substantial issues of fact raised by the parties, this Court stated that "although *Dura Pharmaceuticals* contains language that supports the Defendants' interpretation of the requirement of economic loss in the PSLRA, the Defendants' legal position as applied to the facts of this case may re-

quire an extension of *Dura Pharmaceuticals* that is not required by either Supreme Court or Third Circuit precedent." December 23, 2005 Mem. at 27. Accordingly, the Court concluded that, because the issues of economic loss and loss causation were so fundamental to the situation of SERS as the Lead Plaintiff, the Court would deny Defendants' Motion to Dismiss without prejudice and allow for expedited discovery and expert reports on that issue, after which either or both parties could bring a dispositive motion.[2]

Plaintiff filed the Revised Consolidated Amended Class Action Complaint on January 9, 2005 (Doc. No. 138). On February 7, 2006, CIGNA brought its second Motion to Dismiss. In an opinion dated March 24, 2006, the Court granted the motion in part and denied the motion in part. The Court directed SERS to file a new Revised Consolidated Amended Class Action Complaint ("the Complaint"), making the deletions specified in the Court's March 24 Memorandum and not making any additions. SERS filed the Complaint on March 30, 2006.[3] Merits discovery has generally concluded as of August 18, 2006.

## II. Summary of Relevant Facts, Expert Reports, and the Parties' Briefing

### A. SERS's Trading in CIGNA Stock

The following background information is essentially undisputed. SERS managed its domestic equities portfolio by using twenty-three external investment managers. Each investment manager was charged with investing the funds allocated to it in accordance with parameters established by agreement with SERS, including performance measures appropriate to the investment manager. During the class period, SERS had positions in CIGNA shares in six different investment advisor accounts: Iridian, First Quadrant, Standish Mellon, Twin Capital, Martingale, and J.P. Morgan. Several of the investment managers (First Quadrant, Iridian, and Martingale) engaged in only long transactions, one (Standish Mellon) engaged in only short selling, and the others had both long and short transactions. At any given time during the class period, as reflected by transaction records, one or more of the investment managers might be buying CIGNA stock, while others were selling, selling short, or purchasing to cover short sales. *See* Defs' and Pl's Statements of Disputed and Undisputed Facts at ¶¶ 12–28.

While there are some disputes about SERS's trading in CIGNA stock, many of those disputes are based upon the intermingling of factual contentions and legal arguments. One important dispute is over how to value SERS's CIGNA stock purchased before the start of the class period.

---

**2.** Following on the heels of the December 23 Memorandum, the Court, on December 30, 2005, entered a revised pretrial scheduling order, which directed SERS to file an amended complaint, and also dictated that Defendants' dispositive motion on the grounds of failure to demonstrate economic loss, if any, was to be filed by March 31, 2006. The Order also stated that discovery on the issue of economic loss would close on March 21, 2005, and that SERS was required to serve expert reports on the issues of economic loss by February 21, 2006, while Defendants were to do so by March 10, 2006.

**3.** On March 30, 2006, the Court also granted SERS's Motion to allow two other putative class members, the Miami General Employees' Sanitation Employees Retirement Trust ("Miami Employees") and the Public Employees' Retirement System in Mississippi ("MPERS"), to intervene as additional proposed class representatives. SERS no longer seeks to represent the class. Defendants challenge SERS's status as Lead Plaintiff if it does not seek to represent the class.

The Court recognizes that there do remain some purely factual disputes about SERS's trading in CIGNA stock; however, both financial records and statements of the parties make it possible for the Court to make two basic factual determinations for the purposes of deciding this motion.

The first determination is that SERS sold more CIGNA stock during the class period than it bought during the class period. Much of the stock sold was owned at the beginning of the class period. Relevant financial records establish that SERS sold a total of 189,200 shares of CIGNA stock during the class period but purchased only 36,800 CIGNA shares during the same period. In total, therefore, during the class period, SERS sold 152,400 more shares than it purchased.[4] *See, inter alia*, Defs' Mot. for Summ. J., Ex. 2 (SERS Transaction Report produced by Mark McGrath); *id.* at Ex. 3 (Certification of Harold Dunbar, former Chief Counsel of SERS); Declaration of Dr. Bruce Stangle at ¶ 7 and Ex. 1; Pl's Resp. Ex. A (Supplemental Declaration of Todd Albaugh). And, as noted above, SERS profited from those sales.

The second determination is that SERS has specifically identified 5,000 shares of Cigna stock purchased in its First Quadrant account during the class period and still held at the end of the class period. Defendants do not dispute the purchase but the record is not clear as to whether these shares are included in the Defendants' 36,800 number of shares purchased. In addition, SERS opened a 3,900 CIGNA share short position in its Standish Mellon account during the class period and maintained this short position until after the end of the class period. Therefore, at the very least, SERS had a net long position of 1,100 CIGNA shares purchased during the class period and held at the end of the class period. Accordingly, it is a correct statement that SERS held CIGNA shares on the close of the class period, on October 24, 2002, which SERS purchased during the class period. *See, inter alia*, Declaration of Dr. Scott Hakala at ¶ 36; Declaration of Dr. Steven Feinstein at ¶¶ 1–2; Deposition of Dr. John Peavy at 92–93, 95–96; Deposition of Dr. Bruce Stangle at 69–70; Pl's Resp., Ex. A (Supplemental Declaration of Todd Albaugh).

## B. Expert Declarations

SERS and CIGNA have each offered the opinions of two experts. SERS has submitted declarations made by Drs. Scott Hakala and Steven Feinstein, and CIGNA has submitted declarations made by Drs. John Peavy and Bruce Stangle. As a threshold matter, the Court notes that three of the four experts (all but Dr. Feinstein) have admittedly employed, adopted, or recommended economic models that would not necessarily be relevant for the purpose of proving the amount of damages in securities cases. Nonetheless, as a prelude to the legal analysis, the Court will review, in summary fashion, the substance of the expert declarations.

### 1. Dr. Scott Hakala (Plaintiff's Expert)

Dr. Hakala posits that, after the drop of CIGNA's share price following relevant disclosures, SERS realized both an investment loss and an economic/inflationary loss associated with positions (purchases and short sales) it established during the class

4. What portion of the CIGNA shares sold during the class period were purchased before the class period, as opposed to during the class period, is in some dispute. However, that dispute does not change the fact that, when viewing purchases and sales of CIGNA stock during the class period, SERS sold far more shares than it purchased.

period.[5]  Hakala Dec. at ¶ 10, 14–28.  Dr. Hakala suggests that economic loss is a damage measure that is "well recognized and has been consistently applied by experts in securities litigation."  *Id.* at ¶ 12 n. 6.  He further notes his opinion that investment gains and losses on trades during the class period can not necessarily be correlated with economic gains and losses.  *Id.* at ¶ 23–28.

Dr. Hakala explains that in order to determine realized economic loss, trades must be matched.  *Id.* at ¶ 10, 29–30.  Matching means that one should ideally match specific sales with specific purchases in an economically consistent manner.  Dr. Hakala opines that the matching of purchases and sales is properly done only by account, rather than across the entire investment portfolio (*i.e.,* netting all accounts) because SERS's accounts were segregated and separately managed.  *Id.* at ¶ 36.  Furthermore, Dr. Hakala suggests that, for purposes of that matching, LIFO, last-in-first-out,[6] is not the appropriate accounting method; rather, the appropriate method is either FIFO, first-in-first-out,[7] or specific identification ("specific ID"), which more accurately reflect "economic substance."[8]  *Id.* at ¶ 30–35.

Indeed, Dr. Hakala found that FIFO is the preferred method of matching for the purposes of proof of claim in securities litigation.  *Id.* at ¶ 35.

Applying these principles, in this case Dr. Hakala concludes that SERS's purchases and sales of CIGNA shares, in segregated accounts managed by separate managers, should not be co-mingled and must be matched only within individual accounts.  After so matching, Dr. Hakala concludes that SERS realized both an investment and economic loss in particular accounts.  *Id.* at ¶ 36.

### 2.  Dr. John Peavy (Defendants' Expert)

Dr. Peavy discusses modern portfolio theory ("MPT"), which emphasizes that an investor should focus on an entire portfolio instead of any individual security.[9]  Peavy Dec. at ¶ 16.  According to MPT, an important means to control portfolio risk is diversification, whereby investments are made in a wide variety of assets so that exposure to the risk of any particular security is limited.  *Id.* at ¶ 17.  Thus, in effect, MPT evaluates a security's "diversification effect" on a portfolio.  *Id.*  SERS employs MPT and the associated diversifi-

---

**5.** Dr. Hakala defines investment loss as what occurs "when an investor purchases a share and later sells that share for less than the purchase price."  He defines an economic/inflationary loss as what occurs when "a shareholder purchases shares at an inflated price and then sells (or hold those shares after the class period) at a less inflated price."  In the case of short sales, the order of transactions is reversed but the principle is the same.  Hakala Dec. at ¶ 12–13.

For purposes of this Memorandum, the Court uses the term "economic loss" instead of "economic/inflationary loss."

**6.** LIFO matches the sale of a share of stock to the price paid for the newest share in inventory.

**7.** FIFO matches the sale of a share of stock to the price paid for the oldest share remaining in inventory.

**8.** FIFO is the default method for matching purchases and sales of a security for tax purposes absent an explicit choice otherwise (*see* IRS Publication 550).  Specific ID is usually employed for investment company accounting.

**9.** Because investment returns on different assets are not perfectly correlated with each other, under MPT the risk level of an investment is judged by looking at the combined expected return and risk profile of a portfolio, not according to the individual characteristics of a security included in the portfolio.  Peavy Dec. at ¶ 22.

cation mandate in the investment management of its assets. *Id.* at ¶ 18.

Dr. Peavy suggests that given the fact that SERS focuses its entire portfolio on controlling risk, relies largely on allocating assets among asset classes to generate returns, and employs external investment managers to manage its assets, it would be unusual for SERS to focus attention on a single security. *Id.* at ¶ 19–23. In the "unusual case" that SERS were to direct attention to a single security, such as CIGNA stock, Dr. Peavy posits that SERS would do so "at the aggregate level, that is, observing the aggregate amount of security holdings across all investment managers." *Id.* at ¶ 23. Moreover, Dr. Peavy contends that "it would be contrary to MPT and accepted investment practice to disaggregate holdings in a particular security in order to consider the gains/losses produced by a specific manager(s) while at the same time excluding the gains/losses incurred by another manager(s)." [10] *Id.*

Based on these principles, Dr. Peavy contends that Dr. Hakala uses improper methodology to estimate SERS's economic losses. First, Dr. Peavy opines that Dr. Hakala's methodology of matching trades within separate accounts is inconsistent with market portfolio theory and the fair market value accounting treatment described above. *Id.* at ¶ 42–45. Next, Dr. Peavy contends that Dr. Hakala's discussion of FIFO, LIFO, and cost accounting is irrelevant because the "accounting standards that apply to physical inventories do not govern the accounting treatment for equity investments such as CIGNA stock." *Id.* at ¶ 47. He states that "[e]quity investments are governed by GAAP and FASB standards that do not use inventory costing methods such as FIFO, LIFO or average cost." *Id.* Finally, Dr. Peavy concludes that by applying FIFO and average cost methodologies to trading activity in CIGNA stock during the class period, Dr. Hakala improperly included unrealized losses from periods prior to the beginning of the class period in his calculations, as the prices presented by Dr. Hakala appear to be calculated as some type of average cost for CIGNA stock holdings in the respective accounts. *Id.* at ¶ 48–49. Dr. Peavy argues, however, that the closing market price of CIGNA stock on November 1, 2001 must be used to calculate gains under fair market value accounting because it is the only price that allows SERS to determine the market value of its CIGNA stock at the beginning of the class period.[11] *Id.*

Dr. Peavy suggests that the differences between Dr. Hakala's estimated average cost of CIGNA stock for each manager's holdings and the actual closing market price on November 1, 2001 are unrealized losses from time periods prior to the class period. *Id.* at ¶ 49. However, fair market value accounting restricts the recognition of losses to the reporting (*i.e.*, class) period. As a result, Dr. Peavy concludes that Dr. Hakala's inclusion of prior unrealized

---

**10.** Applying MPT, Dr. Peavy opines that the key performance measurement statistic of "total rate of return," based on a security's market value (not cost basis or book value), is the most appropriate measure of a security's investment performance. Indeed, internally, SERS and its auditors use these particular metrics (pursuant, in part, to the Financial Accounting Standards Board's Generally Accepted Accounting Principles ("GAAP")). Peavy Dec. at ¶ 25–29.

**11.** To illustrate, Dr. Hakala's Exhibit B lists the "Actual Price" for CIGNA stock on November 1, 2001 at $101.2252 per share in the Iridian account, at $89.288 per share in the First Quadrant account, and at $79.6865 per share in the Standish Mellon account. However, the closing market price for CIGNA stock on November 1, 2001 was $71.61.

losses substantially overstates the amount of estimated losses in the class period.[12] *Id.* at ¶ 50–52. To the contrary, Dr. Peavy opines that, by applying fair market value principles and methodology, it is possible to conclude that SERS actually had an investment gain in CIGNA stock transactions during the class period of approximately $1.9 million dollars. *Id.* at ¶ 51, 56.

### 3. Dr. Bruce Stangle (Defendants' Expert)

Dr. Stangle begins his analysis by positing that SERS was overwhelmingly a net seller of CIGNA shares during the class period. Stangle Dec. at ¶ 6–7. This is important, he suggests, because SERS alleges that shares were overvalued (*i.e.,* inflated) during the class period. That fact is critical, according to Dr. Stangle, because if a shareholder sells shares during the class period that were purchased before the class period when there was no inflation, the shareholder benefits by the amount of inflation at the time of the sale. *Id.* However, if a person purchases and then sells shares and the amount of inflation remains constant, there is no economic loss. *Id.*

Dr. Stangle concludes that SERS sold a total of 189,200 shares and purchased only 36,800 shares during the class period—a ratio of more than five to one. *Id.* at ¶ 7. Therefore, SERS sold 152,400 more shares than it purchased. Based on these numbers, Dr. Stangle opines that it is "highly unlikely that, overall, SERS suffered any economic loss from its trading in CIGNA stock." *Id.* at ¶ 8. More specifically, Dr. Stangle concludes that there is no economic loss to SERS because "sales at inflated prices more than cancel out any possible loss from purchases at inflated prices during the class period." *Id.* at ¶ 9.

Dr. Stangle also contends that Dr. Hakala wrongly concluded that SERS was a net purchaser at all times during the class period for several reasons, including that Dr. Hakala's conclusions are not supported by facts concerning the trading in individual accounts; Dr. Hakala's estimated losses are fundamentally flawed and/or meaningless due to use of an improper methodology; and Dr. Hakala grossly overstates SERS's purported losses by his use of FIFO accounting to match purchases and sales of stock. *Id.* at ¶ 11–32. Dr. Stangle recommends use of LIFO accounting over use of FIFO accounting; however, he mainly advocates for use of fair market value accounting, which applied here, he concludes, demonstrates an investment gain of nearly two million dollars on SERS's investments in CIGNA. *Id.* at ¶ 33–35.

### 4. Dr. Steven Feinstein (Plaintiff's Expert)

Dr. Feinstein agrees with Dr. Hakala that it is necessary to match buy and sell trades in particular, individual accounts. Feinstein Dec. at ¶ 21–22. After doing so, Dr. Feinstein opines that SERS suffered an economic loss on shares of CIGNA stock purchased during the class period and held until after the end of the class period—specifically, the shares held in the First Quadrant account.[13] *Id.* at ¶ 12–15. He finds this to be true even taking into account gains on the short position opened in the Standish Mellon account during the class period and covered after the class

---

12. Dr. Peavy also suggests that Dr. Hakala's decision to ignore cash dividend payments made by CIGNA throughout the class period contributes to an improperly understated total rate of return.

13. Dr. Feinstein's conclusion is the same irrespective of whether FIFO or LIFO accounting is used.

period. *Id.* at ¶ 15. He asserts no other CIGNA shares were bought by SERS during the class period and held until afterwards. *Id.* at ¶ 14.[14]

Next, Dr. Feinstein posits that fair market value accounting, recommended by Drs. Peavy and Stangle, incorporates assumptions and methodologies that are inconsistent with computing damages in 10b–5/PSLRA securities litigation. *Id.* at ¶ 35–42. He opines that fair market value accounting requires that stock holdings be valued at the beginning and end of a class period using market prices; however he asserts the PSLRA explicitly prohibits the valuation of the remaining stock holdings at the end of the class period using the current market value.[15] *Id.* at ¶ 38. Second, he suggests that fair market value accounting blends together shares purchased prior to the class period with shares purchased during the class period; however, shares purchased prior to the class period are not the subject of the 10b–5 action. *Id.* at ¶ 39. Indeed, he contends that if the profit or loss on the shares purchased before the class period was not caused by the relevant misstatements, then it is irrelevant and must be excluded—however, fair market value accounting incorporates rather than excludes such profit or loss. *Id.* at ¶ 40.

Stated succinctly, Dr. Feinstein concludes that, as a result of using an inappropriate methodology, the investment gain arrived at by Drs. Peavy and Stangle is *not relevant for the computation of economic loss* and damages for three main reasons: (a) it includes shares purchased outside of the class period[16]; (b) it does not represent true economic loss because it does not take into account the change in price inflation caused by CIGNA's alleged misrepresentations; and (c) it does not use actual purchase prices.[17] *Id., passim.*

Rather than employ fair market value accounting, Dr. Feinstein agrees with Dr. Hakala that use of FIFO accounting is appropriate, and he suggests that FIFO is the most commonly used accounting method in securities cases. *Id.* at ¶ 24. Indeed, Dr. Feinstein takes issue with Drs. Peavy and Stangle's criticism of FIFO, asserting that it is "simply not true that FIFO is biased and always produces a greater loss." *Id.* at ¶ 27. Furthermore, Dr. Feinstein agrees with Dr. Hakala's use of cost basis methodology to establish the beginning value of the CIGNA shares in SERS's portfolio (again, rather than fair market value principles). *Id.* at ¶ 49–58. Dr. Feinstein contends that the criticism of Drs. Peavy and Stangle of Dr. Hakala's use of cost basis methodology "relies on a blind assumption that losses incurred prior to the class period were not caused by the

---

**14.** Defendants do not specifically dispute this assertion.

**15.** Rather, the PSLRA dictates use of the 90–day rule, which assigns a value to remaining shares based on the average price of the stock over the 90 days subsequent to the disclosures ending the class period. 15 U.S.C. § 78u–4(e); Feinstein Dec. at 38; Stangle Dec. at ¶ 28 n. 47.

**16.** This is improper, according to Dr. Feinstein, for two reasons. First, it is based on the "unfounded" assumption that losses and gains must be netted, and, second, it assumes

that there was no inflation in the CIGNA share price prior to the class period (an assumption which Dr. Feinstein believes to be "likely false"). Feinstein Dec. at ¶ 17–22.

**17.** Dr. Feinstein also contends that the portfolio accounting methodology known as the AIMR Performance Presentation Standards ("AIMR–PPS"), also recommended by Drs. Peavy and Stangle, is a inappropriate methodology for computing damages, as they do not compute dollar profit or loss for any portfolio or any position. Feinstein Dec. at ¶ 43–48, 68.

alleged misrepresentations" because Drs. Peavy and Stangle conducted no loss causation analysis and offered no evidence whatsoever that the misrepresentations did not cause losses (either realized or unrealized) prior to the class period. *Id.* at ¶ 54–58.

Finally, Dr. Feinstein takes strong issue with Dr. Peavy's advocacy for the application of MPT, asserting that Dr. Peavy's "logic is flawed and conclusion is wrong." *Id.* at ¶ 60. Dr. Feinstein argues that fraud that causes a loss to any single position in the portfolio necessarily reduces the aggregate performance of the portfolio, results in dollar losses, and causes diminution of the wealth of the investor. *Id.* As such, while diversification may mitigate the impact of investment losses on the welfare of the investor, dollar losses by fraud "are not erased by diversification and do hurt." *Id.* at ¶ 61. In short, Dr. Feinstein concludes that, even under MPT, an investment loss in any single position unequivocally brings down the return of the entire diversified portfolio by a measurable amount—*i.e.*, "the investment loss suffered on an individual security, even within a diversified portfolio, is very real." *Id.* at ¶ 64.

### C. Parties' Contentions Concerning Economic Loss

Defendants contend that, for purposes of determining whether a party has suffered an economic loss, all of SERS's transactions in CIGNA stock during the class period (*i.e.*, across all investment manager accounts) must be considered in the aggregate. Stated differently, Defendants argue that SERS defies the concept of economic loss by making a claim based on a loss in one investment manager account while, overall, SERS achieved a gain

in the aggregate of its CIGNA stock transactions during the class period. Defendants maintain that treating the CIGNA shares that SERS held in different investment accounts separately, rather than as a cohesive whole is contrary to MPT, which governs the way SERS treats its own investments. Defendants posit that if transactions in CIGNA shares are not aggregated across accounts, then SERS has achieved what amounts to an insurance policy with respect to any investment manager account that registers a loss.

Defendants further contend that, when all of SERS's transactions in CIGNA stock are aggregated, SERS incurred no economic loss because it was overwhelmingly a net seller of CIGNA stock during the class period in which the price was rising. In doing so, Defendants adopt and employ much of the opinions of Drs. Peavy and Stangle regarding (1) criticism of Dr. Hakala's methodology and conclusions and (2) application of MPT methodologies and fair market value accounting principles.[18] Even assuming that the price of CIGNA's common stock was indeed artificially inflated during the class period, Defendants assert that, when analyzed with the proper methodology and under the correct accounting principles, the only possible conclusion is that SERS made more money on each share sold than it would have made absent the inflation, and, as a result, it actually benefited from the inflation rather than suffered a loss. Defendants conclude, therefore, that SERS cannot demonstrate an economic loss that qualifies it to assert a securities claim.

In response, SERS contends that Defendants have not met their burden to show that SERS has no evidence that it suffered economic loss, and, indeed, that SERS has

---

**18.** Citing to the opinions of Drs. Peavy and Stangle, Defendants conclude that "Dr. Haka-

la's approach makes no sense ..." *See* Defs' Br. at 13–16.

shown that there are genuine issues of fact regarding the amount of its economic loss and damages which must be decided by the trier of fact. SERS maintains that these disputed issues include (1) the amount of inflation in CIGNA's stock price during the class period caused by Defendants' fraud, (2) the amount of inflation in CIGNA's stock price that was removed by the October 24, 2002 press release that ended the class period, and (3) whether there were any partially corrective events prior to October 24, 2002 which would result in additional inflationary/economic loss.[19]

SERS asserts that Defendants and Defendants' experts have only addressed investment loss, which is different from economic loss and damages under the federal securities laws.[20] Moreover, SERS argues that Defendants' entire argument about SERS's purported investment gain depends on the use of methodologies and an accounting method (*i.e.,* MPT, fair market value accounting, and AIMR–PPS) which are normally used for a different purpose than calculating gain or loss on a particular stock and have never been used to calculate either investment or economic loss in federal securities litigation. SERS further contends that Defendants' offset theory (*i.e.,* netting across investment manager accounts) has been "uniformly rejected by Courts in this District and elsewhere, has never been accepted by any court and is contrary to well-established law and the [PSLRA]." Pl's Resp. Br. at 5 (citing *Argent Classic Convertible Arbi-*

*trage Fund, L.P. v. Rite Aid Corp.,* 315 F.Supp.2d 666, 680–82 (E.D.Pa.2004)).

Finally, SERS contends that to grant Defendants' motion, the Court would have to disregard facts of record and depart from well-established legal principles. For example, SERS argues that the Court would have to: (1) disregard the fact that SERS purchased 5,000 shares of CIGNA stock in its First Quadrant account during the period, and which it held at the end of the class period, and had a net long position in CIGNA stock at the end of the class period; (2) find that, contrary to caselaw, gains and losses which are not proximately caused by Defendants' conduct are relevant to and should be counted in determining economic loss and damages under the federal securities laws; (3) find that, contrary to caselaw, economic gains can be used to offset or "cancel out" economic losses; (4) disregard the uniform conclusions of both parties' experts that the quantification of economic loss cannot be determined without event studies which determine the amount of inflation due to Defendants' conduct on each day of the class period; and (5) make unnecessary decisions about issues relating to the calculation of investment loss (which SERS maintains is not relevant to economic loss and damages), such as whether FIFO or LIFO should be used, whether fair market value accounting should be used, and whether receipt of dividends should offset an investment loss.

---

**19.** The Court notes that in addition to the October 24, 2002 statements that end the damage period, SERS also relies on an October 4, 2002 "partially-corrective event" (*i.e.,* the release of the Solomon Report), which allegedly caused a decline of approximately $9.00 in the price of CIGNA stock in one day.

**20.** Indeed, SERS argues that even if Defendants were correct on every issue they raise

relating to investment loss/gain, none of those issues would be relevant to or determinative of the fact or amount of SERS's inflationary/economic loss. SERS asserts that that these issues are essentially red herrings which distract from the relevant issue—the existence of SERS's inflationary/economic loss on shares held at the end of the class period.

## III. Discussion

### A. Pre-*Dura Pharmaceuticals* Law Concerning Economic Loss and Damages

■ In a fraud on the market case, a plaintiff must show that, as a result of alleged misrepresentations and in reliance on an honest market, the plaintiff purchased shares which, when the alleged fraud was revealed, were worth less than the plaintiff had paid for those same shares. *See, e.g., Basic Inc. v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194. To do so, a plaintiff, under § 10(b) and Rule 10b–5 [21], must prove, *inter alia,* economic loss and loss causation. More specifically, a plaintiff must prove (1) that he or she suffered an actual economic loss and (2) that the alleged misrepresentations proximately caused the decline in the security's value. *Semerenko v. Cendant Corp.,* 223 F.3d 165, 184 (3d Cir. 2000).

■ Regarding loss causation, a plaintiff must prove that there is a sufficient causal nexus between the loss and the alleged misrepresentation. *Id; see also, e.g., In re Royal Dutch/Shell Transp. Sec. Litig.,* 2005 U.S. Dist. LEXIS 32190 (D.N.J. Dec. 12, 2005). In a fraud on the market case, a plaintiff may establish the element of loss causation by showing (1) that he or she purchased a security at a market price that was artificially inflated due to a fraudulent misrepresentation, and (2) that the stock price "dropped in response to disclosure of the alleged misrepresentation." *Semerenko,* 223 F.3d at 184–86.[22]

■ The concept of economic loss and damages is somewhat more complicated. The Supreme Court has noted that courts have generally applied an out-of-pocket measure of damages—*i.e.,* the difference between the fair value of what the plaintiff received and the fair value of what the plaintiff would have received had there been no fraudulent conduct—in Section 10(b) cases involving fraud by a seller of securities. *See Randall v. Loftsgaarden,* 478 U.S. 647, 662, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986); *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). As such, the Third Circuit gener-

---

**21.** Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment] ... of any ... deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." 15 U.S.C. § 78j(b). Securities and Exchange Commission Rule 10b–5 forbids, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R. 240. 10b–5 (2004). The Supreme Court has implied from these statutes and Rule a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation. *See, e.g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 196, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 744, 95 S.Ct. 1917, 44 L.Ed.2d 539, (1975). Congress has imposed statutory requirements on that private action. *See, e.g.,* 15 U.S.C. § 78u–4(b)(4); *Dura Pharmaceuticals,* 125 S.Ct. at 1631.

**22.** Courts have recently held that a plaintiff must explicitly show that the market reacted negatively to either a corrective event or disclosure or a materialization of a concealed risk. *See, e.g., Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 173–75 (2d Cir.), *cert. denied,* —— U.S. ——, 126 S.Ct. 421, 163 L.Ed.2d 321 (2005); *In re Tellium, Inc. Sec. Litig.,* 2005 WL 2090254 at *3 (D.N.J. Aug. 265, 2005) (holding that a plaintiff must allege a corrective disclosure or some other corrective event). *See also In re Compuware Sec. Litig.,* 386 F.Supp.2d 913, 920 (E.D.Mich.2005) (applying *Dura Pharmaceuticals* and holding that a plaintiff that sold its shares before the "truth" was revealed could not establish loss causation).

ally considers the difference between the purchase price and the "true value" of a security at the time of the purchase to be the proper measure of economic loss and of damages that reflect the loss proximately caused by fraud. *Semerenko*, 223 F.3d at 184–86. *See also Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 297 (3d Cir. 1991). Therefore an investor's proximate "economic loss" is the actual amount that is attributable to the unrecovered inflation in the purchase price. *See Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1345 (9th Cir.1976) (Sneed, J., concurring). In addition, the artificial inflation must actually be "lost" due to the alleged fraud—where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation.[23] *Semerenko*, 223 F.3d at 184–85.

■ Rule 10b–5 and the PSLRA do not endorse any economic theory or methodology that should be used to quantify/demonstrate economic loss. Prior to the *Dura Pharmaceuticals* decision, some lower courts, albeit in widely varying contexts, adopted a "transaction-based" methodology to calculate economic loss and damages rather than a "cumulative" approach that aggregates transactions (*i.e.*, "off-sets" gains and losses stemming from different transactions). A transaction-based methodology treats each transaction separately and therefore "allows claims for unprofitable transactions ... without offsetting the recoverable loss with gains from profitable transactions." *Argent*, 315 F.Supp.2d at 680. These decisions have refused to allow alleged gains to cancel out purported losses, and they have rejected arguments that a plaintiff who was

a "net seller" and made money during the class period could not proceed with claims under federal securities laws. *See, e.g., Nesbit v. McNeil*, 896 F.2d 380, 386 (9th Cir.1990), *abrogated on other grounds, Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (affirming a lower court's refusal to permit an offset of trading gains against losses on plaintiff's investments in a "churning" case, and stating that denying defendants an offset for portfolio gains "serves to forward the deterrent policies which underlie the federal securities laws"); *Davis v. Merrill Lynch, Pierce, Fenner & Smith*, 906 F.2d 1206, 1218 (8th Cir.1990) (rejecting the argument that because a churned account recognized a "cumulative net profit," no actual damages were sustained, and refusing to allow offset for profits in calculating damages); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 2004 U.S. Dist. LEXIS 27008 at *10 (N.D.Cal.2004) (rejecting as "premature and unpersuasive at the class certification stage" the argument that certain plaintiffs were not appropriate class representatives because they made money during the class period and were "net sellers"); *In re Blech Sec. Litig.*, 2003 U.S. Dist. LEXIS 4650 at *72 (S.D.N.Y.2003) (in calculating damages, "[d]efendants are not entitled to an offset, factoring in any gains made by" in and out traders who sold their shares prior to the end of the class period); *Burke v. Ruttenberg*, 102 F.Supp.2d 1280, 1302 n. 32 (N.D.Ala.2000) (holding that the plaintiff's "alleged gains during the early period of his trading cannot be offset against his purported losses"); *Kane v. Shearson Loeb Rhoades, Inc.*, 1989 U.S. Dist. LEXIS 19022 at *15–23 (S.D.Fla.

23. In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price.

1989) (stating that "[s]uch an aggregation method for the calculation of out of pocket damages in a securities action undermines one of the principal goals of both federal and state securities laws: deterring fraud," and concluding that the proper damage methodology "should have been to treat each transaction separately rather than to have aggregated them"); *In re Clinton Oil Co. Sec. Litig.*, 1977 U.S. Dist. LEXIS 16787 at *5 (D.Kan.1977) (holding that "profit/loss margins on sales of shares obtained in separate and independent purchase transactions should not be offset for the purpose of reaching a net figure").

In many of these decisions, a frequently cited justification for adopting a transaction-based methodology is that aggregation (*i.e.*, offsetting) undermines a major goal of the securities laws—namely, deterrence of fraud.

As noted above, the transaction-based methodology was endorsed by Judge Dalzell, in *Argent*, who reasoned that "[n]either the statute nor the Rule authorize any sort of aggregation of purchases or sales that could sanction the cumulative approach [to determine plaintiff's damages]." *Argent*, 315 F.Supp.2d at 681. After noting, as an example, that "[a plaintiff] is entitled to recover his $50 loss on January 15 because that loss was attributable to his purchase and sale of 50 identifiable shares," Judge Dalzell squarely concluded that "[i]t would be inequitable to deprive [a plaintiff] of any recovery because his purchase and sale of different shares happened to be profitable." *Id.*[24]

*Argent* is arguably consistent with Judge Sneed's well-publicized analysis of recovery under the out-of-pocket measure of damages in his concurring opinion in *Green v. Occidental Petroleum Corporation*, 541 F.2d 1335, 1346 (9th Cir.1976) (Sneed, J., concurring), holding that a wrongdoer should not be permitted to satisfy its obligation to compensate purchasers for losses "by appropriating a portion of each purchaser's investment gain." Indeed, Judge Sneed concluded that the consequence of doing so would be "denying any recovery so long as a purchaser's selling price exceeded the purchase price. To permit such an appropriation by a wrongdoer is no more just than to charge the wrongdoer with investment losses not proximately caused by his misrepresentations." *Id.* (cited with approval by the Third Circuit in *Semerenko*, 223 F.3d at 185). *See also In re Clearly Canadian Sec. Litig.*, 966 F.Supp. 930 (N.D.Cal.1997) (Judge Vaughn Walker's exposition of what is sometimes called the "Sneed/Walker" approach).

Defendant cites, however, to several decisions of record in which courts have criticized the results of a transaction-based methodology. In *In re Comdisco Securities Litigation*, 150 F.Supp.2d 943 (N.D.Ill. 2001)—a case in which SERS was also the plaintiff and Dr. Hakala was also plaintiff's expert—the District Court rejected SERS application to be lead plaintiff, and in support of this conclusion found that SERS's transaction-based loss calculation was "only a mirage created by [SERS's] adoption of a FIFO ... approach to its dealings in the stock" because its "class period sales at inflated prices caused it to derive

---

**24.** The Court notes that *Argent* involved a slightly different scenario than the case sub judice. In *Argent*, the issue was whether transactions occurring *after* the damage period on which the plaintiff made money should be netted against transactions during the damage period on which it lost money. Here, the issue is whether transactions that resulted in gains and losses, where some of the purchases were prior to the damage period, but purchases and sale occurring *during* the class period, should be netted.

unwitting benefits rather than true losses." *Id.* at 945. Likewise, the Court in *Arenson v. Broadcom Corp.*, 2004 WL 3253646 (C.D.Cal.2004), in granting summary judgment against a number of individual plaintiffs, held that those plaintiffs could not establish losses because they profited from the alleged fraud by selling their shares of stock at an artificially inflated price. The court, citing to a Ninth Circuit decision from 1987, rejected FIFO methodology as a matter of law, and held that "where a plaintiff engages in multiple purchases and sales during the period in which the stock is inflated, the proper damages methodology is to take all the inflation losses resulting from all purchases at the inflated price and reduce this amount by all the inflation gain resulting from all sales at the inflated price." *Id.* (citing *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1437 & n. 4 (9th Cir.1987)).

The Court also notes Judge Scheindlin's recent opinion in *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y.2005). In that case, the Court was selecting among various entities who were competing to be appointed lead Plaintiff. The Court rejected one in favor of another because it found that one party's "losses due to the [defendant's] alleged fraud were actually somewhat cushioned by the sales made when [defendant's] stock price was high, sales that are not taken into account" by the plaintiff's use of a "first-in-first-out" method of accounting. *Id.* at 101. After reviewing many cases discussing LIPO and FIFO damage calculations, and selecting the other party to be Lead Plaintiff, the Court noted that it did so in part because the party used LIFO and "offset[ ] 'gains' that were attained through the sale of stock during the class period." *Id.* at 102. In doing so, the Court noted that offsetting gains and losses is a "better measurement of the true damages sustained by the plaintiffs." *Id. See also, e.g.,*

*In re Goodyear Tire & Rubber Co. Sec. Litig.*, 2004 WL 3314943, *4 (N.D.Ohio 2004) (finding the LIFO method preferable to the FIFO method); *In re AOL Time Warner*, 2006 WL 903236 (S.D.N.Y.2006) (discussing FIFO and LIFO in context of allocation of settlement).

The Third Circuit has not had occasion to consider the issue. This Court has fundamental concerns arise about adopting any specific theory as a matter of law when deciding a motion for summary judgment. Indeed, Defendants' authorities are not fully on point to the facts of this case. For example, the *Comdisco* Court aggregated all sales during the class period but deducted only the cost of shares bought during the class period (*i.e.*, it included the profit from sales purchased before the class period but not the corresponding cost). *Comdisco*, 150 F.Supp.2d at 944–46. Some cases rule that only transactions during the class period are relevant. *See In re Schering–Plough Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 26297 at *26 (D.N.J. Oct. 10, 2003) ("FSBA's Section 19(b) claim is based on losses that resulted from purchases of Schering Plough stock made *during* the class period. Any capital gains made with respect to the sale of shares purchased before the class period are irrelevant."); The *Comdisco* and *In re eSpeed* decisions interpret the term "largest financial interest" in the context of the choice of a lead plaintiff, and some authority suggests that "financial interest" in that context is not synonymous with damages. *See, e.g., In re Ribozyme Pharm., Inc. Sec. Litig.*, 192 F.R.D. 656, 659–60 (D.Colo. 2000). Finally, and perhaps most importantly, in *Comdisco* and *eSpeed* there was no evidence—as there is in the instant case—of a specific number of shares in a specific account bought during the class period at specific Sprices and held in that account when the price of the stock

dropped due to alleged fraud. As discussed *supra*, *Argent* clearly suggests that the instant plaintiff has a right to recover the loss on those shares.

## B. The Impact of *Dura Pharmaceuticals*

Did *Dura Pharmaceuticals* implicitly endorse any specific theory or methodology for the quantification of economic loss? The Supreme Court reiterated that the securities laws seek to maintain public confidence in the marketplace, and they do so by deterring fraud, in part, through the availability of private fraud actions. However, the Court warned that the statutes make these actions available not to provide investors with broad insurance against market losses, but only to protect them against those actual economic losses that misrepresentations actually cause. As noted above, *Dura Pharmaceuticals* only rejected the Ninth Circuit's position that, for pleading purposes, a plaintiff need only establish that "the price *on the date of the purchase* was inflated because of the misrepresentation." *Id.* at 1631 (quoting *Broudo v. Dura Pharmaceuticals, Inc.*, 339 F.3d 933, 938 (9th Cir.2003)) (emphasis added by the Supreme Court). The Court held instead that an inflated purchase price does not, by itself, constitute or proximately cause the relevant economic loss.

To date, no Court of Appeals has ruled on the impact of *Dura Pharmaceuticals* on the establishment of economic loss and damages for purposes of proof at trial. Nor has any court granted summary judgment on similar facts as here.[25]

Although decided after *Dura Pharmaceuticals*, in the context of deciding a class certification motion, *In re Sepracor Inc. Securities Litigation*, 233 F.R.D. 52 (D.Mass.2005) rejected Defendants argument that the plaintiff's profits from other transactions during the class period should be offset against the plaintiff's losses at the end of the class period when the fraud was revealed.[26] Judge Lasker adopted the reasoning of *Argent*, but did not cite *Dura Pharmaceuticals*.[27]

Due to the procedural posture of the case—*i.e.*, a Rule 12(b)(6) motion—*Dura Pharmaceuticals* was focused merely on the sufficiency of the plaintiff's initial pleadings, and does not address methodologies for quantifying economic loss. The parties' extensive briefing in the Supreme Court included specific discussion of Judge Sneed's out-of-pocket approach to damages (as set forth in *Green*, discussed *supra* ). However the Supreme Court did not even mention that topic in the *Dura Pharmaceuticals* opinion.

---

**25.** Judge Pisano recently concluded in *In re Royal Dutch/Shell Transport Securities Litigation*, 2005 U.S. Dist. LEXIS 32190 (D.N.J. Dec. 12, 2005), that *Dura Pharmaceuticals* is consistent with the Third Circuit's existing precedent for pleading economic loss and loss causation. Although *Royal Dutch* involved a motion to dismiss and was therefore decided at the pleadings stage, the Court nonetheless notes Judge Pisano's well-reasoned conclusion that "the standard for pleading economic loss and loss causation in the Third Circuit ... was not undermined by *Dura*." It was not necessary for Judge Pisano to reach the further question of whether *Dura Pharmaceuticals*, although not changing the standards for pleading, might have some impact on

proof/measurement of economic loss for the purposes of summary judgment.

**26.** *See* Exhibit A to SERS's Post–Argument Memorandum dated November 29, 2005 (Doc. No. 119).

**27.** The Court notes that, as *Argent*, *Sepracor* involved a slightly different scenario than the case *sub judice*. In *Sepracor*, the issue was whether profitable transactions in one type of security (*i.e.*, stocks) should be offset against profitable transactions in another security (*i.e.*, bonds), where both sets of transactions occurred during the class period.

It is difficult to conclude that *Dura Pharmaceuticals* stands for an endorsement of any particular economic loss/damage principles of law. *See, e.g.,* Bloomenthal and Wolff, *Securities and Federal Corporation,* § 16:110–11 (2d ed.2006) (discussing the impact of *Dura Pharmaceuticals* on determining damages). *Dura Pharmaceuticals* explicitly stated that it "need not, and d[id] not, consider other proximate cause or loss-related issues." 125 S.Ct. at 1634.[28] The closest the Court came to the issue before this Court was its statement that private actions under the securities laws are designed to protect investors against economic losses that misrepresentations "actually cause." *Id.* As such, there is nothing in *Dura Pharmaceuticals* that explicitly holds that (a) an investor who suffers damages from specifically identified transactions cannot recover losses from those transactions, or (b) that investor's other trading in the company's stock is relevant to a claim for damages based on the isolated transactions.

For these reasons, and after a careful examination of the law as discussed *supra,* this Court is inclined to conclude, at this point in time and unless the Third Circuit holds to the contrary, that *Dura Pharmaceuticals* has not changed existing law concerning the measurement of economic loss and damages in securities cases, and has not rejected the economic theory proffered by Plaintiffs.

The Court has carefully reviewed the expert declarations in this case. Defendant's experts urge the court to measure economic loss by implementing economic models based on an investment theory— *i.e.,* to analyze SERS's economic loss under the rubric of MPT, fair market value accounting, AIMR–PPS, and related prin-

ciples and methodologies. Doing so, the Defendants' experts maintain, would require the netting of profits and losses during the class period and would essentially obligate the Court to conclude that SERS suffered no economic loss or damages. However, as the experts concede, investment theory has little relevance to the calculation of damages. In addition, Defendants' theory uses sales of stock purchased prior to the damage period, which is highly questionable. The Court does not find any persuasive authority that would justify adopting, as a matter of law, as part of an analysis under *Dura Pharmaceuticals,* in the context of summary judgment, either an economic theory that was contrary to well-supported damage calculation cases in fraud on the market cases, or a causation analysis that was not based on established case law related to securities jurisprudence.

Rather, the Court finds that there is a significant amount of authority which would allow a jury to apply a transaction-based methodology, if based on adequate evidence, to calculate economic loss and damages, rather than requiring the jury to apply a cumulative approach that aggregates transactions and off-sets gains and losses stemming from different transactions. The specific calculation of damages in this case should be resolved based on a trial record, rather than at the summary judgment stage. The Court will not reject the vitality of transaction-based methodologies on these facts on a motion for summary judgment.

Although, as noted in the opening paragraph of this Memorandum, from a cumulative point of view (considering SERS's overall transactions in CIGNA stock), SERS did not suffer an economic loss on

---

**28.** *See* Defs' Resp. to SERS's Post–Argument Mem. at 5 ("[T]he Supreme Court in *Dura* rejected the adequacy of an averment that a loss occurred at the time of the purchase if the purchase price was inflated, and did not address the situation here....").

its investment in CIGNA stock, the precedents do not translate that obvious conclusion into summary judgment in favor of CIGNA. If SERS's purchases of CIGNA stock had occurred entirely within the class period, Defendants' contention about economic loss would be more compelling. Granting summary judgment in favor of Defendants would adopt an economic theory that has support in a few cases and economic literature, but should not be established as a binding principle of law in this case. The Court reserves any final decision about Defendants' contentions until after a record has been made at a trial, where all of the evidence relevant on SERS purchases can be presented and subjected to cross-examination.

SERS is entitled to develop, before a jury at trial, the background of the investments made in CIGNA stock on behalf of SERS. It appears that the investment

managers, rather than SERS itself, made all of the decisions.[29] The great majority of CIGNA stock sold by SERS during the class period was purchased before the class period. Assuming the facts of these purchases are admissible into evidence at trial, there is an open question as to what instruction should the jury be given about the relevance of these purchases—namely, how the Court should instruct the jury to consider the gains made by SERS on its sales of CIGNA stock during the class period, on those shares purchased before the class period. Although the experts disagree on whether it is appropriate to use FIFO or LIFO, there is no appellate ruling that a judge must charge a jury that one of these is proper to the exclusion of the other. If the jury is charged on and accepts SERS's transaction-based theory, the issue of FIFO or LIFO may not be relevant.[30]

29. Although this motion did not require the parties to detail evidence as to the reasons why SERS purchased CIGNA stock, it appears fairly undisputed from the evidence so far submitted, (the Court realizes there may be other evidence) that SERS itself had little or no input into the purchase of CIGNA stock on its behalf by the various investment managers which it employed.

The origin of the securities laws was, of course, in the 1930's depression era, when Congress determined that individual investors needed protection against fraud. Prior to the PSLRA, the great majority of securities fraud suits were brought on behalf of individual investors who had purchased a particular stock, and alleged that its price was inflated because of fraud. With the advent of the PSLRA, the lead plaintiffs in securities fraud cases now tend to be larger purchasers, and in many instances, retirement funds or other public entities, such as pension funds, as is SERS, where purchasing decisions are made by investment managers using sophisticated computer programs, rather than by the owner of the stock.

These observations may be totally irrelevant under the fraud-on-the-market concept, and they do not impact this ruling on economic loss in the context of summary judgment.

30. Applying a transaction-based methodology, as most clearly enunciated in the declaration of Dr. Feinstein, at the end of the class period SERS had suffered a loss on 5,000 shares purchased during the class period and held in the First Quadrant account on October 24, 2002. Taking into account the 3,900 share short position SERS held in the Standish Mellon account, SERS was, at the very least, long in 1,100 shares it had purchased during the damage period. The fact that SERS was a net seller (including shares purchased prior to the damage period), is not of particular relevance to whether SERS suffered a loss on these specific shares. As mentioned *supra*, "[a plaintiff] is entitled to recover his $50 loss on January 15 because that loss was attributable to his purchase and sale of 50 identifiable shares," and "[i]t would be inequitable to deprive [a plaintiff] of any recovery because his purchase and sale of different shares happened to be profitable." *Argent*, 315 F.Supp.2d at 681. If CIGNA committed fraud on the market, nothing in the law compels this Court at this stage to allow CIGNA to satisfy its obligation to compensate SERS for losses by appropriating a portion of SERS's investment gain. Given the policy behind the securities laws (namely, deterring fraud), dis-

The Court notes that, in view of the fact that SERS, although seeking to continue its Lead Plaintiff status, is no longer seeking to act as a class representative, and in view of the Court's simultaneous filing with this Memorandum and Order, an Order allowing Plaintiffs MPERS and Miami Employees to maintain this case as a class action and serve as class representatives, granting Defendants' motion for summary judgment against SERS would do nothing to advance the termination of this litigation. Rather, the fact that there are now two class representatives as to which there does not appear to be any dispute about economic loss makes the disposition of this motion, although important to SERS, not necessarily otherwise relevant to the ultimate outcome of this case. Since the case will be tried on a class basis, SERS's purchases and sales of CIGNA stock will not have any significant impact on the CIGNA's liability.[31]

Finally, granting summary judgment on the present record would deprive the Plaintiffs of their constitutional right under the Seventh Amendment to have a jury decide all issues concerning the award of damages. As the Court said in *Feltner v. Columbia Pictures Television,* Inc., 523 U.S. 340, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998).

> "... 'the common law rule as it existed at the time of the adopting of the Constitution' was that 'in cases where the amount of damages was uncertain [,] their assessment was a matter so pecu-

liarly within the province of the jury that the Court should not alter it.'" *Id.* at 353, 118 S.Ct. 1279 (quoting *Dimick v. Schiedt,* 293 U.S. 474, 480, 55 S.Ct. 296, 298, 79 L.Ed. 603 (1935)).

In *Dimick v. Schiedt,* a personal injury negligence action, the Court also said: "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in American history and jurisprudence that any seeming curtailment of right to jury trial should be scrutinized with the utmost care."

*See also, e.g., Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (noting, in an antitrust case, the importance of having a jury determine issues relating to damages).

■ Before concluding, the Court also notes that there are disputes of material fact surrounding both the amount of inflation attributable to the alleged fraud and the effect of "corrective events" on the price of CIGNA stock. The experts disagree, for example, as to whether the alleged fraud was the sole cause of the inflation, and as to the impact of a "partially corrective event" prior to the generally accepted corrective event on October 24. These facts are clearly material to the determination of the extent of SERS's economic loss, and the existence and complexity of these disputes (including the absence of any conclusive time studies by either party) suggest to the Court that the task

---

missal of SERS at this stage is not appropriate in the face of the specific shares on which SERS alleges it suffered a loss due to CIGNA's fraud.

**31.** It is, of course, possible that as part of the trial the Court would submit special interrogatories to the jury to determine whether SERS suffered economic loss. Although doing so would surely be determinative of whether SERS is entitled to damages, it

would have arguably little impact on the conduct of the liability aspects of the trial, or on the theory of damages presented by the class representatives on behalf of the class.

The Court notes that there may be other members of the class with CIGNA purchases and sales similar to SERS. Although neither party has suggested SERS as a representative of a subclass of such CIGNA shareholders, this concept deserves consideration.

of determining the precise measure of economic loss and damages here is best assigned to the factfinder at trial.

## IV. Conclusion

For all the reasons explained at length herein, the Court finds that (1) *Dura Pharmaceuticals* does not compel a fundamental change in the way this Court should analyze proof of economic loss; (2) at this time it is not be appropriate to adopt the investment model advanced by Defendants to measure economic loss under the federal securities laws; (3) one of several methods used by courts prior to *Dura Pharmaceuticals* to analyze and quantify economic loss and damages is a transaction-based methodology; (4) applying that methodology, SERS has a viable claim for economic loss based on particular shares held at the end of the class period; and (5) there are disputes of material fact related to economic loss and damages that make summary judgment particularly inappropriate; and (6) a jury should be permitted to make relevant factual determinations for the purposes of calculating damages.[32] In the absence of more defined jurisprudence on the impact of *Dura Pharmaceuticals*, the Court finds that *Dura Pharmaceuticals* does not require dismissal of SERS at this point in time. Accordingly, the Court will deny the Motion for Summary Judgment Based on Lack of Economic Loss without prejudice.

An appropriate Order follows.

**ORDER**

AND NOW, this day of August, 2005, after careful review of arguments presented to the Court by both parties during oral argument and in numerous, detailed pleadings, it is hereby ORDERED that Defendants' Motion for Summary Judgment Based on Lack of Economic Loss (Doc. No. 182) is DENIED without prejudice.

---

**32.** The Court notes in passing that while out-of-pocket loss is the ordinary standard in a 10b–5 suit, damages can, at the discretion of the judge, be measured in several ways, including, in appropriate circumstances, "benefit of the bargain," rescission, or consequential damages. *Randall*, 478 U.S. at 662, 106 S.Ct. 3143 (citing *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir.1975)); *Sowell*, 926 F.2d at 297 (3d Cir.1991); *Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F.Supp. 557, 567

(W.D.Pa.1996). Without taking any position on the availability of any such alternative damage measures to SERS, the Court notes that if SERS did have some right to rescission or consequential damages, for example, rather than to pure out-of-pocket damages, there does not appear to be anything in *Dura Pharmaceuticals* or in the literature that would bar such recovery even though SERS did not have a net economic loss in its CIGNA transactions.