In re VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION.

No. 02 Civ. 5571(SAS).

United States District Court,
S.D. New York.

July 5, 2012.

Arthur N. Abbey, Esq., Richard Barry Margolies, Esq., Stephen Thran Rodd, Esq., Stephanie Dawn Amin–Giwner, Esq., Abbey Spanier Rodd Abrams & Paradis, LLP, New York, NY, Sol Schreiber, Esq., Sylvia Wahba, Esq., Michael Champlin Spencer, Esq., William Beecher Scoville, Jr., Esq., Matthew Gluck, Esq., Milberg LLP (NYC), New York, NY, Brian C. Kerr, Esq., Brower Piven, A Professional Corporation, New York, NY, for Plaintiffs.

Daniel Slifkin, Esq., Paul C. Saunders, Esq., Timothy Gray Cameron, Esq., Cravath, Swaine & Moore LLP, New York, NY, Penny Packard Reid, Esq., James W. Quinn, Esq., Weil, Gotshal & Manges LLP, New York, NY, for Defendants Vivendi Universal, S.A. and Universal Studios, Inc.

## OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge:

### I. INTRODUCTION[1]

On September 21, 2011, class counsel filed the following motions: (1) to adjust the class definition; (2) to approve plaintiffs' proposed procedures for the "Individual Reliance Phase"; (3) to approve post-verdict class notice and claims administration and to require Vivendi to pay for those procedures; (4) to award prejudgment interest; and (5) to apply for attorneys' fees and costs. On February 8, 2012, this class action was transferred from Judge Richard Holwell's docket to my docket. On April 2, 2012, a status conference was held in which I requested additional briefing on certain topics pertaining to the pending motions.[2] This opinion resolves the pending motions and establishes a preliminary framework for moving this class action towards a final resolution.

### II. CLASS DEFINITION

#### A. Plaintiffs' Request to Eliminate Geographic Restrictions

■ On May 21, 2007, Judge Holwell first defined the Class as "consisting of all persons from the United States, France, England, and the Netherlands who purchased or otherwise acquired ordinary shares or American Depository Shares ['ADSs'] of Vivendi Universal, S.A. between October 30, 2000 and August 14, 2002."[3] "The ordinary shares in question traded primarily on the Paris Bourse, and did not trade on any U.S. exchange. The [ADSs] were listed and traded on the New York Stock Exchange ('NYSE')."[4] Thereafter, the U.S. Supreme Court decided *Morrison v. National Australia Bank Ltd.*,[5] holding that "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."[6]

In his decision addressing Vivendi's motions for judgment as a matter of law and a new trial, Judge Holwell modified the Class definition in light of *Morrison*, stating as follows:

> the Court finds that the Section 10(b) claims of Americans who purchased Vivendi's ordinary shares, like the claims of foreigners who purchased Vivendi's ordinary shares, do not survive *Morrison*. Accordingly, these claims are dismissed. Furthermore, the Court hereby amends the class definition in this case to exclude purchasers of ordinary shares. The class going forward shall consist of all persons from the United States, France, England and the Netherlands who purchased or otherwise acquired Vivendi ADRs between October 30, 2000 and August 14, 2002.[7]

■ Plaintiffs argue that because the Court dismissed the claims of Vivendi ordinary share purchasers pursuant to *Morrison*, it is no longer appropriate to limit the Class to purchasers from the four specified countries (U.S., France, England, and the Netherlands).[8] Plaintiffs seek to re-define the Class as "all persons who purchased or otherwise acquired American Depository Shares ... of Vivendi between October 30, 2000 and August 14, 2002."[9] Plaintiffs further pro-

---

1. Familiarity with the extensive factual and legal background to this litigation is presumed. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F.Supp.2d 512 (S.D.N.Y.2011) (sometimes referred to as the "February 17, 2011 Order").

2. *See* 4/2/12 Tr.

3. *In re Vivendi Universal*, 242 F.R.D. 76, 109 (S.D.N.Y.2007) (the "Class Certification Order").

4. *In re Vivendi Universal*, 765 F.Supp.2d at 521.

5. —— U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010).

6. *Id.* at 2888.

7. *In re Vivendi*, 765 F.Supp.2d at 533–34 (citations omitted).

8. *See* Plaintiffs' Memorandum of Law in Support of Renewed Motion at 9 ("Plaintiffs submit that since all purchasers of foreign securities have now been excluded from the class, the geographic limitations included in the original 2007 decision are no longer necessary or appropriate.").

9. *Id.* at 8–9.

pose that class members who are not from the four aforementioned countries be given a chance to "opt out now." [10]

Vivendi strenuously objects to broadening the definition of the Class on a number of grounds. *First,* Vivendi argues that claims of ADS holders from countries other than the United States, France, England and the Netherlands are time-barred. According to Vivendi, plaintiffs' request to remove the "geographical limitations" is, in actuality, a request to resurrect claims for which the statute of limitations has long since passed. The statute of limitations for plaintiffs' Section 10(b) claims is between one year (for pre-July 30, 2002 fraudulent activity) and two years (for post-July 30, 2002 fraud). [11] To the extent that excluded ADS holders (from outside the U.S., France, England and the Netherlands) wanted to preserve their claims, they were required to file complaints soon after the Court issued its Class Certification Order on May 21, 2007. In fact, certain Vivendi ADS holders that had been excluded from the certified Class filed the first of thirty-five complaints. For those ADS holders who did not file a complaint following their exclusion from the Class, the statute of limitations continued running and consequently expired on May 21, 2008 or May 21, 2009. Vivendi claims that it would suffer extreme prejudice if the Class definition were expanded to include all purchasers of ADSs regardless of their country of residence. [12]

*Second,* Vivendi argues that there is no legal basis for "adjusting" the definition of the Class at this time. In other words, *Mor-*

*rison* has no impact on the Class Certification Order which was based, in part, on the superiority of the class action mechanism. In analyzing superiority, the Court evaluated the likelihood that a U.S. judgment would be recognized in the Class members' respective countries of residence. [13]

The February 17, 2011 Order did not address the Rule 23(b)(3) issues that were central to the Class Certification Order. Unlike the Class Certification Order, the February 17, 2011 Order focused on the validity of the claims of Vivendi ordinary share purchasers in light of *Morrison,* not whether their claims were appropriate for class action treatment. Accordingly, nothing in *Morrison* or the February 17, 2011 Order alters the superiority analysis in the Class Certification Order. Thus, there is no legal basis for now amending the definition of the Class.

Finally, Vivendi argues that Rule 23 does not permit the Court to amend the definition of the Class under these circumstances. In 1966, Rule 23 was amended to end the practice of "one-way intervention." [14] One-way intervention eviscerated the mutuality of estoppel in class actions. Under the current policy against one-way intervention, it would be improper to let plaintiffs opt into a class after a trial on the merits has concluded.

In sum, plaintiffs' motion to amend the class definition is denied because (1) claims by ADS holders outside the U.S., France, England and the Netherlands are time-barred and (2) nothing in *Morrison* has changed Judge Holwell's analysis concerning

---

10. *Id.*

11. *See* Section 804 of the Sarbanes–Oxley Act of 2002.

12. *See* Defendant Vivendi, S.A.'s Memorandum of Law in Opposition to Plaintiff's Renewed Motion ("Def. Opp. Mem.") at 8 ("Adjusting the class definition to include these putative class plaintiffs more than two years after their claims became time barred, and more than four years after the Class Certification Order, would severely prejudice Vivendi, as Vivendi had no notice of the pendency of these claims at the time of trial and, moreover, justifiably believed that the statute of limitations on these claims had run.").

13. *See* Class Certification Order at 105 ("Having considered the arguments presented by both

sides on the risk of nonrecognition of a U.S. judgment or settlement abroad, the Court concludes that such concerns, without more, do not warrant exclusion of the citizens of France, England, and the Netherlands, who are otherwise putative members of the proposed class. If and when the issue is presented to these countries, it is more likely than not that the courts in these countries would recognize the enforceability of a judgment or settlement in the present case.").

14. *See* Fed.R.Civ.P. 23(c)(1)(A) ("At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.").

the likelihood that certain countries would recognize a U.S. class action judgment.

### B. Plaintiffs' Request to Restore Ordinary Shareholders to the Class Definition

On March 29, 2012, plaintiffs notified the Court that they intended to request yet another modification to the class definition. Plaintiffs seek to restore to the class those individuals who purchased Vivendi ordinary shares in the United States. Specifically, they request the following language be added to the class definition:

> All persons from the United States, France, Netherlands and England who during the class period purchased or otherwise acquired Vivendi ordinary shares in a 'domestic transaction,' which includes a transaction in which the parties incurred irrevocable liability to carry out the transaction within the United States or when title is passed within the United States.

Plaintiffs also proposed additional instructions to be included on the claims form suggesting that three categories of ordinary shareholders would fall under this new addition to the class definition: (1) purchasers of the January 7, 2002 Vivendi treasury share sale from a U.S. underwriter; (2) persons from the United States who received Vivendi Universal ordinary shares as a result of the December 2000 three-way merger; and (3) persons from the United States who purchased Vivendi Universal ordinary shares in off-exchange transactions directly from a person in the United States.[15] After a brief discussion of the applicable law on the extraterritorial application of the Exchange Act, I consider, collectively, whether any of these three categories could have involved a transfer of title in the United States. Then, I consider each category in turn to determine whether any purchaser may have incurred irrevocable liability in the United States.

#### 1. Extraterritorial Application of the Exchange Act

"Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." [16] The second prong of *Morrison* ("the purchase or sale of any other security in the United States") has presented many questions of interpretation for lower courts.

■■■ The Second Circuit recently clarified the second prong of *Morrison* holding that "to sufficiently allege the existence of a 'domestic transaction in other securities,' plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States." [17] After reviewing the Exchange Act definitions for "purchase" and "sale," the Second Circuit noted "that the 'purchase' and 'sale' take place when the parties become bound to effectuate the transaction," [18] thereby equating "irrevocable liability" with entering into a binding contract.

#### 2. Title to Vivendi Universal Ordinary Shares Did Not Pass in the United States

■■ Plaintiffs argue that, with respect to the December 2000 three-way merger, the "parties ... passed title in the United States

---

**15.** While plaintiffs propose an amended class definition that includes "persons from the United States, France, Netherlands and England," their proposed additional instructions, which identify three categories of ordinary shareholders that may have entered into domestic transactions, only contemplate "persons from the U.S." Because plaintiffs have not raised a single colorable argument that persons from France, Netherlands or England would have purchased Vivendi Universal ordinary shares in a transaction subject to the Exchange Act, I limit my consideration to persons from the United States. Although I recognize that the *Morrison* and *Absolute Activist* tests focus on the locus of the transaction, not the parties' citizenship or residence, plaintiffs have made no argument suggesting that a person from France, Netherlands or England would have entered into a transaction in the United States to purchase a French stock.

**16.** *Morrison*, 130 S.Ct. at 2888.

**17.** *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir.2012) (as amended Apr. 13, 2012) (quoting *Morrison*, 130 S.Ct. at 2884).

**18.** *Id.*

by virtue of the terms of the merger and the registration and delivery of the shares in the U.S."[19] However, plaintiffs cannot and have not pled any factual allegations suggesting that title for any Vivendi Universal ordinary shares passed in the United States.

Vivendi's Form F–4 represents that, "[i]n accordance with French securities law, shareholders' ownership rights, whether in registered or bearer form, are represented by book entries instead of share certificates."[20] These book entries are maintained in share accounts with the French depository, Sicovam, and "no other company is authorized to act as a central depository."[21] BNP Paribas, which administers the Sicovam accounts, "will issue confirmations to each registered shareholder as to shares registered in the shareholder's account, but these confirmations are *not documents of title.*"[22] Because title to Vivendi Universal shares is maintained in book entries in France, there is no justification for adding to the class purchasers of Vivendi Universal ordinary shares "when title is passed within the United States." No such purchasers exist.

### 3. The January 2002 Treasury Share Sale

■ Plaintiffs propose adding the following instruction to the claim form: "Receipt by a person from the U.S. of Vivendi Universal ordinary shares directly from a U.S. underwriter or manager of an underwriting in or about January 2002 of Vivendi Universal treasury shares is a domestic transaction."[23] However, Vivendi's January 7, 2002 sale of fifty-five million treasury shares used two foreign underwriters—Deutsche Bank AG London and Goldman Sachs International

(also based in London).[24] Plaintiffs have made no allegations supporting an inference that any portion of the January 7, 2002 treasury share sale was made through underwriters in the United States. Accordingly, the treasury share sale cannot serve as a basis to expand the class definition.

### 4. The Vivendi–Seagram–Canal Plus Three–Way Merger

■ Plaintiffs argue that U.S. holders of Vivendi ordinary shares and Canal Plus shares became irrevocably liable in the United States to acquire new Vivendi Universal ordinary shares as a result of the December 2000 merger. Specifically, plaintiffs believe that irrevocable liability was incurred because "of the investor's status as holder of the pre-Merger securities and her obligation to accept the new ordinary shares at the time they were registered in the U.S."[25]

Vivendi argues that "shareholders of the pre-Merger companies did not incur any liability to do anything; their shares were exchanged without any action on their part."[26] Moreover, the basis for plaintiffs' argument that the Exchange Act reaches these shares—that the new ordinary shares were registered in the United States and that they were designated for U.S. persons—was rejected in *Absolute Activist.*

Vivendi correctly notes that *Absolute Activist* rejects the argument that SEC registration is determinative because *Morrison* refers to "domestic transactions in other securities,"[27] not "transactions in domestic securities" or "transactions in securities that are registered with the SEC." In addition,

---

**19.** Plaintiffs' Supplemental Memorandum Regarding Class Definition and Damage Calculation Issues ("Pl. Supp. Mem.") at 2.

**20.** 10/30/00 Vivendi Universal Form 4–F, Ex. 1 to 5/9/12 Declaration of Daniel Slifkin, defendants' counsel, in Support of Vivendi's Memorandum of Law in Opposition to Plaintiffs' Motion for Amendment to the Class Definition ("Slifkin Decl."), at 158.

**21.** *Id.*

**22.** *Id.* (emphasis added).

**23.** Pl. Supp. Mem. at 2.

**24.** *See* 1/10/02 letter from Andrew A. Bernstein, counsel to Deutsche Bank AG London, to Deutsche Bank AG London, Ex. 2 to Slifkin Deck, at 1.

**25.** Plaintiffs' Supplemental Reply Memorandum Regarding Class Definition and Damages Calculation Issues at 4.

**26.** Vivendi's Memorandum of Law in Opposition to Plaintiffs' Motion for Amendment to the Class Definition at 8.

**27.** *Morrison,* 130 S.Ct. at 2884.

the fact that the shares were designated for U.S. persons is not conclusive because "a party's residency or citizenship is irrelevant to the location of a given transaction." [28]

Thus, the question is whether irrevocable liability was incurred when the recipients of the Vivendi Universal ordinary shares actually received the shares or when the Merger Agreement was signed binding the recipients to accept the Vivendi Universal ordinary shares.[29] In a related matter, I have previously rejected an argument that irrevocable liability occurs when the shares are actually transferred, but rather held that irrevocable liability occurs when (and where) there is a binding contract for the purchase or sale of a security.[30] Although class plaintiffs were not a direct party to the three-way merger agreement, as shareholders they were bound by it to accept the Vivendi Universal ordinary shares. There has been no evidence presented, or even allegations made, that the Merger Agreement among Vivendi, Seagram, and Canal Plus—French and Canadian companies—was executed in the United States. Accordingly, there is no basis for extending the Exchange Act to reach those shareholders who acquired Vivendi Universal ordinary shares as a result of the December 2000 three-way merger.

### 5. Off–Exchange Transactions in the United States

■ Plaintiffs request an instruction that the following transactions be included in the class: "Receipt by a person from the U.S. of Vivendi Universal ordinary shares in a purchase transaction directly from another person from the U.S., including from a U.S. broker owning the shares (typically noted as acting 'as principal'), without the use of the Bourse or other non-U.S. exchange." [31]

Vivendi objects to including these transactions for a number of reasons: (1) plaintiffs supply no evidence that such transactions ever occurred; (2) plaintiffs' reference to persons "from the U.S." is overbroad under *Absolute Activist*; (3) determination of where irrevocable liability was incurred raises substantial factual issues that should be determined by a jury; and (4) off-exchange transactions raise individual reliance issues not presented to the jury.

The individualized issues raised by participants in off-exchange transactions preclude resolution of their claims along side the claims of current class members. Although participants in off-exchange transactions in the United States (if any exist) may have claims under the Exchange Act, plaintiffs have pointed to no ruling in this litigation that all participants in off-exchange transactions may receive the benefit of the fraud-on-the-market presumption of reliance. Indeed, I have held that Liberty Media—in a related case—was not entitled to the full benefit of the fraud-on-the-market presumption in connection with its off-exchange transaction.[32] Moreover, the class trial focused on purchases made on the NYSE and the Paris Bourse.[33] So while Vivendi will have an opportunity to rebut the presumption of reliance that inure to class members, participants in off-exchange transactions would likely have the burden of establishing reli-

28. *Absolute Activist*, 677 F.3d at 70.

29. Although neither side has made an argument that irrevocable liability was incurred when shareholders ratified the Merger Agreement, or even discussed whether shareholder ratification was required for this transaction, the locus of the shareholder approval might be the proper test in this case. However, I will not accept further briefing on that issue because I do not believe it would change the result. There is little likelihood that a shareholder meeting approving a merger agreement between French and Canadian companies occurred in the United States.

30. *See Liberty Media Corp. v. Vivendi Universal, S.A.*, No. 03 Civ. 2175, 861 F.Supp.2d 262, 269-

70, 2012 WL 1203825, at *4 (S.D.N.Y. Apr. 11, 2012) ("Irrevocable liability was incurred when the Merger Agreement was executed on December 16, 2001. The Merger Agreement was a binding agreement, not a preliminary agreement, and therefore satisfies the standard for irrevocable liability.").

31. Pl. Supp. Mem. at 1–2.

32. *See Liberty Media*, No. 03 Civ. 2175, 3/13/12 Tr. at 21.

33. The jury did not calculate inflation rates for the days these exchanges were closed. Therefore, off-exchange transactions could present distinct questions of damages, which were not resolved in the class trial.

ance. As a result, determination of reliance and damages for participants in off-exchange transactions in the United States require separate trials. Accordingly, plaintiffs' request to amend the class definition is denied in its entirety.[34]

## III. INDIVIDUAL RELIANCE PHASE

Plaintiffs have proven, on a class-wide basis, the element of "justifiable reliance" on Vivendi's misrepresentations, relying on the fraud-on-the-market theory.[35] Vivendi attempted to rebut, on a class-wide basis, the fraud-on-the-market presumption of reliance by asserting a "truth on the market" defense.[36] The jury, however, rejected this defense.

With regard to individualized reliance, Judge Holwell held that "Vivendi is entitled to rebut the presumption of reliance on the market price of Vivendi's stocks with respect to particular class members."[37] Regarding that rebuttal, Judge Holwell stated that

certain means of rebutting the presumption of reliance require an individualized inquiry into the buying and selling decisions of particular class members. For example, the Supreme Court stated in *Basic* that the presumption of reliance would be rebutted if the defendant could show that a particular investor would have purchased a company's stock even if she had known of the fraud, or that a particular investor purchased even though she did actually know of the fraud. Alternatively, if a particular investor relied upon information not generally available to the public, it may be argued that that particular

investor did not rely upon the integrity of the market. Logically, any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of particular class members. For this reason, courts in securities fraud actions have consistently recognized that issues of individual reliance can and should be addressed after a class-wide trial, through separate jury trials if necessary.[38]

Plaintiffs have interpreted the February 17, 2011 Order as restricting the ways Vivendi may rebut individual reliance. According to plaintiffs, rebuttal of individual reliance "can only be shown by proving either (1) that an individual purchased [Vivendi ADSs] while possessing material non-public information, or (2) that a purchase was motivated entirely by reasons unrelated to the precise value of the stock and would have occurred even if the purchaser knew of the fraud."[39] Arguably, then, the individual Class Member's financial sophistication and trading strategies, as well as the reasonableness of the Class Member's reliance on the integrity of the market, are inquires that are outside the bounds of Vivendi's right to rebut.[40]

Under the first step of plaintiffs' proposal, "Vivendi would set forth, on a pleading-type basis, its grounds for rebutting the presumption of reliance as to any particular class member(s)."[41] In the second step, plaintiffs suggest that the Class Members be required to answer the following two interrogatories which would appear in Section III (Certification) of the proposed Proof of Claim form:

**34.** Because *Absolute Activist* reinstated the validity of Exchange Act claims for purchasers of Vivendi Universal shares in off-exchange transactions in the United States, and this Opinion holds for the first time that such plaintiffs are not part of the class, such plaintiffs may bring individual suits against Vivendi (if any such plaintiffs exist and if their claims are not time-barred).

**35.** *See* February 17, 2011 Order, 765 F.Supp.2d at 583.

**36.** *See id.* at 584.

**37.** *Id.* at 583.

**38.** *Id.* at 584–85 (citations omitted).

**39.** Plaintiffs' Memorandum of Law in Support of Renewed Motion at 4.

**40.** *See id.* at 4–5 (limiting Vivendi's right to rebut "to showing either that a claimant purchased in possession of material non-public information or that the claimant would have made the same purchases even if aware that Vivendi's share price was fraudulently inflated").

**41.** *Id.* at 2–3. *See also id.* at 6 ("Plaintiffs submit that the first step in this phase of the case should be a requirement that Vivendi submit—essentially, plead—its claims that any class member(s) either received material non-public information or purchased despite knowledge of the fraud.").

1. When you bought your Vivendi securities, did you know that the company was making false and misleading statements to the public? (If you answer "yes," your claim will be denied. If you answer "no," your claim may proceed.); and

2. Did you buy your Vivendi securities for reasons totally unrelated to their economic value? (If you answer "yes," your claim will be denied. If you answer "no," your claim may proceed.).[42]

Finally, in the last step, "the responses [of Class Members] should be evaluated in light of the standards for a defendant's rebuttal of the presumption of reliance to determine whether further discovery or other proceedings should be made available."[43] "In the event Vivendi demonstrates a basis for further inquiry into a claimant's individual reliance, the parties or the Court could then determine any appropriate further procedures."[44]

■ Vivendi objects to both the procedures proposed by plaintiffs as well as the limitations placed on Vivendi's right to rebut. Vivendi argues that it "should be allowed to show the unreasonableness of a particular investor's reliance on a case-by-case basis."[45] Vivendi further argues that a Class Member's invocation of the fraud-on-the-market presumption of reliance is rebuttable by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price ...."[46] In *Basic v. Levinson*, the Supreme Court made clear that the two aforementioned methods of rebutting individual reliance were only examples and the means for rebutting individual reliance are expansive and case specific.

Vivendi also objects to the procedures proposed by plaintiffs. Because Class Members

have not yet even been identified, the requirement that Vivendi first plead its grounds for rebuttal does not make much sense. Vivendi proposes the following alternative three-step process:

In the first stage, the parties would have an opportunity to review each Class member's claim to determine whether the claimant *prima facie* meets the elements for relief under Section 10(b) and Rule 10b–5. During this stage, the Class Members would be required to show proof that they purchased or otherwise acquired Vivendi ADSs during the Class Period, as well as provide information that would assist Vivendi in ascertaining whether there may be grounds for challenging individual reliance. In the second stage, the parties would obtain discovery from a limited number of claimants selected by Vivendi and would litigate before the Court whether those claimants satisfy the reliance element under Section 10(b) and Rule 10b–5.... Finally, in the third stage, Vivendi would have an opportunity to contest the reasonable reliance of those claimants whose claims survived the second stage in jury trials, as guaranteed by the Seventh Amendment.[47]

Vivendi proposes three ways that it could challenge individual reliance. *First,* Vivendi may show that it was unreasonable for a particular investor to have relied upon the alleged misstatements and omissions. The investor's level of sophistication and whether the investor based his investment decision on the kind of independent financial analyses typically prepared by large financial institutions would be relevant to this inquiry. *Second,* Vivendi intends to rebut the presumption of reliance for those investors who sold Vivendi shares short. Judge Holwell noted that "whether short sellers can benefit from the fraud on the market presumption is un-

**42.** *Id.* at 7.

**43.** *Id.*

**44.** *Id.* at 3.

**45.** Defendant Vivendi, S.A.'s Memorandum of Law in Opposition to Plaintiffs' Renewed Motion at 14.

**46.** *Basic, Inc. v. Levinson,* 485 U.S. 224, 248, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

**47.** Def. Opp. Mem. at 15–16.

settled." [48] *Third*, Vivendi seeks to rebut reliance by showing that certain Class Members would have purchased Vivendi stock even if they knew the truth about the misstatements in issue.

■ The procedures to be used by Vivendi in rebutting the presumption of reliance were left open by Judge Holwell.[49] I intend to adopt a procedure that differs from either party's proposal. *First*, the notice will be sent to potential class members in substantially the form it has been prepared, without any questions relating to reliance.[50] Vivendi has stated that it "has no intention of contesting the individual reliance of each and every Class member" but instead "only intends to challenge the reliance of sophisticated persons and entities, such as large institutional investors, who may not satisfy the standard of reasonable reliance ...." [51] Once the claim forms have been submitted, Vivendi will have the opportunity to screen large investors by analyzing the information included in Section II of the Proof of Claim form (which includes the maximum number of Vivendi ADSs held during the Class Period; the maximum number of Vivendi ADSs purchased in a single transaction between October 30, 2000 and August 14, 2002; the total number of Vivendi ADSs purchased during the period October 30, 2000 to August 14, 2002; the maximum number of Vivendi ADSs sold in a single transaction between October 30, 2000 and August 14, 2002; and the total number of Vivendi ADSs sold during the period October 30, 2000 to August 14, 2002).

*Second*, based on the information provided in the claims forms, interrogatories relating to reliance will be sent to the limited number of "sophisticated persons and entities" whose reliance defendants choose to challenge. These interrogatories will be prepared by counsel, subject to approval by the Court.

The parties appear to have substantial differences over the scope of the interrogatories; however, those disputes will be resolved at the time counsel submit proposed interrogatories.

*Third*, a Special Master will determine which claimants' interrogatory responses raise a triable issue of material fact sufficient to potentially rebut the presumption of reliance. If challenges to any claimant's reliance survive this quasi-summary judgment determination by the Special Master, subject to review by this Court, I will consider proposals for an efficient manner to decide individualized reliance with respect to those claims. However, it would be premature to set forth any procedures before knowing how many claimants' interrogatory responses will present a triable issue of individual reliance.

Therefore, this is only a rough sketch of the procedure that will be followed, and is subject to refinement as the claims process proceeds. For now, (1) the initial claims form will be distributed without any questions regarding reliance, (2) the claims forms will be processed by the claims administrator, as discussed below; (3) interrogatories concerning reliance will be sent to a limited number of claimants selected by Vivendi; and (4) the Special Master will make a determination of whether any interrogatory responses raise a material issue of fact as to whether Vivendi can rebut that claimant's presumption of reliance.

## IV. CLASS NOTICE; CLAIMS ADMINISTRATION; DAMAGES METHODOLOGY

Plaintiffs again move for Approval of Post–Verdict Class Notice and Claims Administration, and to Require Vivendi to Pay for Those Procedures that are consistent with the February 17, 2011 Order. Accordingly, plaintiffs renew their requests for: (1) appointment of

---

48. February 17, 2011 Order, 765 F.Supp.2d at 586 n. 65.

49. *See id.* at 586 ("The Court's conclusion that Vivendi is entitled to an opportunity to rebut the presumption of reliance on an individual basis does not answer the question of what procedures should be used during the individual reliance phase.").

50. At the April 2, 2012 conference I circulated edits to the proposed forms. The parties should incorporate these revisions and submit the revised forms to the Court.

51. Def. Opp. Mem. at 16 n. 10.

The Garden City Group, Inc. ("GCG") as claims administrator; (2) approval of the rules for the calculation of damages as set forth in the 3/30/10 Declaration of Dr. Blaine F. Nye on the Method of Calculating Class Member Damages (the "Nye Decl."); and (3) an Order requiring Vivendi to pay for notice and claims processing.

## A. Appointment of Claims Administrator

Plaintiffs seek approval of the appointment of GCG as the notice and claims administrator. GCG was previously appointed by the Court to provide notice of pendency of this class action. As claims administrator, GCG would provide post-verdict notice, described below, and perform all claims administration services.[52] To process claims, GCG would establish a central facility for receiving, handling, and analyzing all claim forms submitted by Class Members ("claims administration"). GCG would analyze the claim forms it receives and determine, according to the rules set forth herein, whether the claim qualifies for damages and, if so, in what amount ("claims disposition").[53] Plaintiffs further suggest that each side appoint a "Party Representative" to review any claim forms as well as claim handling and analysis by GCG personnel.

Vivendi objects to the appointment of GCG on several grounds. Vivendi points out that two elements of a Rule 10b–5 claim—reliance and economic loss—remain unproven at this time as to each individual claimant. According to Vivendi, there is absolutely no authority that would permit GCG to make factual and legal determinations during a litigated claims process. Vivendi also objects to the types of documentation GCG anticipates relying on "as back-up for the transaction information provided by the claimant[.]"[54] Thus, Vivendi argues that

> under Plaintiffs' proposal, GCG would have authority to "determine whether the claim qualifies for damages, and if so, in what amount" and notify "each claimant of the disposition of its claim" before the parties have had the opportunity to review and challenge those claims or solicit additional information from the claimants. Thus, not only would GCG be making factual and legal determinations that are the province of the Court (or its appropriate representative) and, in some instances, a jury, it would be doing so without any input whatsoever from Vivendi.[55]

As an alternative to GCG, Vivendi urges the Court to appoint an independent, neutral special master to oversee the claims process.[56] Vivendi argues that appointment of a special master is especially warranted here given the size of the Class and the large number of anticipated claims which will involve difficult computations of damages.

■ I plan to adopt a middle course. As previously discussed, this case will proceed in two phases: (1) claims forms will be distributed and claimants will have one-hundred fifty days to submit them, and then (2) interrogatories will be sent to certain claimants. With respect to the first phase, GCG is appointed claims administrator to handle the ministerial tasks of processing these initial claims. In doing so, GCG will make initial determinations of a claim's validity by applying this Court's rulings to determine (1) if the claim falls within the Class Period; (2) if the claim yields net losses (and, if so, how much) after applying Court-approved dam-

---

**52.** *See* Declaration of Neil L. Zola, President and Chief Operating Officer of GCG, dated March 30, 2010 (the "Zola Decl.") ¶ 3 (Docket Entry 1026–2).

**53.** *See id.* ¶ 33 ("GCG will program a calculation module to assist in the calculation process.").

**54.** *Id.* ¶ 32 (stating that the documentation to be provided by claimants will also be used to "resolve questions, provide further information, [and] identify open issues").

**55.** Vivendi's Memorandum of Law in Opposition to Plaintiffs' Motion for Approval of Post–Verdict Class Notice and Claims Administration, and to Require Vivendi to Pay for It at 17 (Docket Entry # 1042) ("Vivendi Notice Opp. Mem.").

**56.** *See id.* (citing Fed.R.Civ.P. 53(a)(1) for the proposition that a court may appoint a special master to "hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury" if appointment is warranted by, *inter alia,* the need to resolve a difficult computation of damages).

ages calculations. However, GCG would not be able to notify any claimants of the disposition of their claim before Vivendi has had an *opportunity to challenge* all of these determinations as laid out in the second phase.

With respect to the second phase, I will appoint a Special Master to (1) review the interrogatory responses and consider whether they raise material issues of fact with respect to reliance, (2) review any challenges by defendants to the validity of claims, including whether there is appropriate documentation to support the claim, and (3) review any challenges by defendants to the amount of damages computed by GCG.

### B. Methodology for Computing Damages

According to plaintiffs, "a defrauded purchaser is entitled to recover the difference between the price paid for the stock and the 'fair value' of the stock (value absent the fraud)." [57] Plaintiffs further posit that those transactions that qualify for an award of damages ("qualifying transactions") should be determined as follows:

Under well-established legal rules for damages, calculation of a Class Member's damages with respect to a purchase of Vivendi shares during the Class Period begins with the inflation amount on [the] date of pur-

chase. If those shares were purchased and also sold prior to the first date of materialization of the fraud (January 7, 2002), the purchase will not qualify for damages. Similarly, a purchase and sale of shares occurring on or after one materialization date and before the next one will not qualify for damages. Otherwise, for shares that were purchased and sold during the Class Period, the damages will be the inflation amount on the date of purchase minus the inflation amount on the date of sale; for shares purchased during the Class Period and held beyond the end of the Class Period, the damages will be the inflation amount on the date of purchase. [58]

Plaintiffs seek to calculate damages in accordance with the proposed rules as set forth in the Nye Declaration: (1) a claimant's damages will be equal to the sum of damages for each ADS qualifying transaction for which damages are positive, without any offset for transactions that resulted in gains; [59] (2) a claimant's sales of ADSs will be matched with purchases using FIFO (first in, first out) methodology; [60] (3) the Class Period will be defined as the period from December 8, 2000 through August 13, 2002, inclusive; [61] (4) damages will be awarded for transactions other than purchases or sales, [62] and (5) ADSs

---

**57.** Plaintiffs' Memorandum of Law in Support of Their Motion for Approval of Post–Verdict Notice and Claims Administration, and to Require Vivendi to Pay for It at 4 ("Pl. Mem.").

**58.** *Id.* at 4–5. Vivendi agrees that damages are not incurred on ADSs acquired during the Class Period and disposed of prior to January 7, 2002, the first materialization date, and for ADSs acquired on or after any one materialization date but disposed of before the next materialization date.

**59.** *See* Nye Decl. ¶ 19 ("A Claimant's total Damages are equal to the sum of Damages for each of the above transactions for which Damages are positive.").

**60.** *See id.* ¶ 12.

**61.** *See id.* ¶¶ 5–6. Vivendi objects to Dr. Nye's proposal to redefine the Class Period to begin on December 8, 2000. Vivendi notes that shares of Vivendi Universal were not publicly traded until December 8, 2000 because the merger releasing those shares into the market had not yet closed. Vivendi further notes that the jury found that

Vivendi Universal shares were inflated at a constant amount from October 30, 2000 through December 8, 2000. Vivendi interprets this to mean that shares of the companies that merged to become Vivendi Universal—Vivendi S.A., Seagram and Canal Plus—were inflated. Vivendi concludes, however that "whether the exchange of a Vivendi, S.A., Seagram or Canal Plus share for a Vivendi Universal share is an acquisition is irrelevant to the calculation of damages, because the exchange has no impact on the harm suffered by a claimant." Vivendi Notice Opp. Mem. at 12. The Class Period has been previously identified as starting on October 30, 2000 and ending on August 14, 2002. This is the time period, only modified as necessary to implement the PSLRA 90–day–lookback provision, that will be used for the calculation of damages notwithstanding Dr. Nye's suggestion to the contrary.

**62.** *See* Nye Decl. ¶ 13(c). Vivendi objects on the ground that Section 10(b) prohibits certain activities "in connection with the purchase and sale of any security." 15 U.S.C. § 78j(b). Vivendi argues that by including other transactions, plaintiffs are "attempting to rewrite the language

that are converted to ordinary shares will be treated according to their final form.[63] Three of these proposed rules have been addressed in footnotes below, and I now address the remaining two. Any other damage calculation issues that may arise shall be referred initially to the Special Master.

At the April 2, 2012 conference, I signaled to the parties my initial rulings regarding the netting of gains and losses and the methodology to be used for matching sales and purchases (FIFO v. LIFO). At that conference, I stated that it is appropriate to net gains accrued as a result of selling shares at inflated prices with losses accrued as a result of buying shares at inflated prices.[64] I also informed the parties of my intention to use LIFO (last-in first-out) methodology to match sales and purchases. Plaintiffs' counsel then raised the question of whether netting and LIFO were mutually exclusive.[65] I solicited supplemental briefing on this issue.

After reviewing the parties' submissions in detail, the following rulings are now final.[66]

### 1. Netting Gains with Losses

Vivendi argues that plaintiffs may only recover "actual damages" which represent the out-of-pocket economic loss caused by the fraud. Vivendi urges the Court to net gains and losses when calculating a Class Member's compensable loss. According to Vivendi, the proper amount of damages is determined by taking the actual amount of harm suffered as a result of buying shares at an inflated price and deducting the actual amount of gain accrued as a result of selling shares at an inflated share price.

Plaintiffs object to netting, arguing that Vivendi is seeking to add the following two additional steps to the calculation of damages: "[ (1) ] if a matched transaction yields 'negative damages,' i.e., the claimant received more inflation value at sale than she paid at purchase, that negative 'excess' can

of Section 10(b). Vivendi Notice Opp. Mem. at 13. The Class Definition has always included "all persons from the United States, France, England and the Netherlands who purchased *or otherwise acquired* American Depositary Shares of Vivendi between October 30, 2000 and August 14, 2002." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F.Supp.2d at 587 (emphasis added). Thus, the phrase "purchased or otherwise acquired" has been used throughout this litigation in the Class Definition. *See In re Vivendi Universal, S.A. Sec. Litig*, 242 F.R.D. 76, 109 (S.D.N.Y. 2007) (class certification order). The phrase is redundant, however, because, under the securities laws, a "purchase" is defined to include "any contract to buy, purchase, or *otherwise acquire*." 15 U.S.C. § 78c(a)(13) (emphasis added). While I will not disturb the settled Class Definition, I note that the phrase "or otherwise acquired" is surplusage and does not certify a class broader than that permitted in a Section 10(b) action. Accordingly, plaintiffs concede that category (b) (gift, inheritance, donation) should be removed from the Notice to Class Members. *See* Pl. Supp. Mem. at 3.

63. *See* Nye Decl. ¶ 20(b). Dr. Nye proposes that for shares originally purchased as ADSs and subsequently converted to ordinary shares, the inflation amount at acquisition will be the inflation amount applicable to the final form of the security. Dr. Nye does not explain the rationale underlying this proposal. Plaintiffs' sole justification for this proposal is that it is "practical and efficient." Plaintiffs' Reply Memorandum in Support of Their Motion for Approval of Post–Verdict Class Notice and Claims Administration, and to

Require Vivendi to Pay for It at 5. Vivendi, by contrast, argues that an ADS should be treated as an ADS regardless of its final form. *See* Vivendi Notice Opp. Mem. at 13–14 ("If a claimant purchased an ADS that was inflated by $1.03 on April 24, 2001, that person overpaid by $1.03, regardless of the form of the share at disposition, and his or her out-of-pocket loss cannot be greater than $1.03 minus any inflationary gains."). In dealing with converted securities, the inflation amount at acquisition will be the inflation amount of the form of security originally purchased. As illustrated by Vivendi's hypothetical involving an April 24, 2001 purchaser, this is a common sense approach. I see no reason to measure the inflation of an April 24, 2001 ADS purchaser (even if those ADSs are subsequently converted into ordinary shares) by looking at the inflation figure for ordinary shares.

64. *See* 4/2/12 Tr. at 22 ("Where, as here, an inflation band increases before decreasing, netting is appropriate. Ignoring the benefits an investor receives from selling shares during a period of inflation would incorrectly overstate the economic damages to each investor.").

65. *See id.* at 52.

66. To the extent that this Opinion leaves open any questions concerning calculation of damages, these questions can be raised after claim forms have been submitted. At that time, the Special Master may make an initial determination of additional issues relating to damages calculations, subject to my review.

be applied against any 'positive damages' calculated for other matched transactions, thus reducing overall damages; and [(2)] a claimant's sale during the class period matched to a purchase *before* the class period will always yield 'negative damages' (because the inflation prior to the class period is zero) that can be applied against 'any damages' incurred on purchase-and-sale transactions occurring during the class period." [67]

Plaintiffs cite *Dura Pharmaceuticals v. Broudo*[68] for the proposition that an investor who purchases and later sells shares during the period prior to the first materialization date is precluded from claiming, as damages, losses from such pre-materialization-date transactions. Assuming this to be true, whether as a result of *Dura* or the parties' own definition of qualifying transactions, plaintiffs argue that it would be unfair to offset post-materialization-date losses (*i.e.*, losses from sales completed after the first materialization date) with pre-materialization-date gains (*i.e.*, gains from sales completed before the first materialization date).[69]

Plaintiffs cite *In re Cigna Corp. Securities Litigation*[70] as an example of a transactional approach to the calculation of damages. In a transactional approach, each transaction is treated separately and losses from unprofitable transactions are not offset with gains from profitable transactions. Such an approach was described as potentially more favorable than a cumulative approach, where all gains and losses would be aggregated.

Rather, the Court finds that there is a significant amount of authority which would allow a jury to apply a transaction-based methodology, if based on adequate evidence, to calculate economic loss and damages, rather than requiring the jury to apply a cumulative approach that aggregates transactions and off-sets gains and losses stemming from different transactions.[71]

"Rule 10b–5 and the PSLRA do not endorse any economic theory or methodology that should be used to quantify/demonstrate economic loss." [72] Thus, this Court has considerable discretion in determining how best to calculate compensable losses. I agree with plaintiffs that not all gains should or could be used to offset legally cognizable losses. Accordingly, the netting methodology to be employed herein is modified as follows: only those gains resulting from transactions occurring between the first materialization date and the end of the Class Period will be used to offset losses incurred during that very same period. This parity between gains and losses should ameliorate the harsh effects that a full netting methodology would entail (where all gains, pre- and post-materialization date, would be used to offset cognizable losses). This methodology will henceforth be referred to as "partial netting." [73]

## 2. LIFO v. FIFO

In matching sales with purchases to compute a Class Member's loss or gain, there are two distinct methods that could be used: the "first-in, first out" ("FIFO") and the "last-in, first out" ("LIFO") techniques. These matching methodologies are distinct from the overall approach to damages de-

---

67. Pl. Supp. Mem. at 5.

68. 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

69. *See* Pl. Supp. Mem. at 6 ("The unfairness arises because *Dura* 'legally' prevents claimants from claiming any 'positive' damages for a matched transaction completed before the fraud began to be revealed, but Vivendi nevertheless proposes as an 'economic' matter to derive 'negative' damages from the same type of transaction.").

70. 459 F.Supp.2d 338 (E.D.Pa.2006).

71. *Id.* at 354. The court, however, did not actually choose a transaction-based methodology over a cumulative approach, finding that the specific calculation of damages should be resolved at trial rather than on a summary judgment motion. *See id.*

72. *Id.* at 350.

73. This approach is consistent with the netting approach traditionally taken by the Second Circuit. *See Abrahamson v. Fleschner*, 568 F.2d 862, 878 (2d Cir.1977) ("This is not to say, however, that a plaintiff may recover for losses, but ignore his profits, where both result from a single wrong.").

scribed above (i.e., netting versus transactional approach).[74]

In the context of a securities class action, FIFO and LIFO refer to methods used for matching purchases and sales of stock during the class period in order to measure a class member's damages. Under FIFO, a class member's damages are calculated by matching her first purchases during the class period with her first sales during the class period. Under LIFO, a class member's damages are calculated by matching the class member's last purchases during the class period with the first sales made during the period. Calculating recovery by means of these different methods can affect the measure of a class members' injury.[75]

Where a Class Member has a number of purchases and sales that must be matched, plaintiffs urge the Court to adopt the FIFO methodology. However, this Court has noted that "[c]ourts prefer the [LIFO] method of accounting and have generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases." [76]

 "The main advantage of LIFO is that, unlike FIFO, it takes into account gains that might have accrued to plaintiffs during the class period due to the inflation of the stock price." [77] "Under the LIFO approach, a plaintiff's sales of the defendant's stock during the class period are matched against the last shares purchased, resulting in an offset of class-period gains from a plaintiff's ultimate losses." [78] Accordingly, damages will be computed using LIFO, where sales of Vivendi ADSs during the Class Period will be matched against the last ADSs acquired by a particular Class Member.

## C. Duration of Claims Processing Period

 Plaintiffs propose that the Court approve the establishment of a "Priority Claim Deadline" set at approximately six months after notice is distributed. Plaintiffs further propose that the Court leave the claims administration procedure open for twenty years, citing CPLR section 211(b). CPLR section 211(b), however, does not govern class action claims administration procedures. Rather, section 211(b) only applies in actions to enforce money judgments.[79] At present, the Class Members do not have an enforceable money judgment. In any event, I agree with Vivendi that a claims administration procedure lasting twenty years is "simply absurd." Accordingly, there will be a one-hundred fifty day deadline after the approval of post-verdict class notice for Class Members to submit their claims. One-hundred fifty days should be sufficient for Class Members to receive notice, collect their pa-

---

**74.** *See* Samuel Francis, *Meet Two–Face: The Dualistic Rule 10B–5 and the Quandary of Offsetting Losses by Gains*, 11 Fordham L.Rev. 3045, 3062–63 (2009) ("Apart from these overall damages approaches, courts at different stages in a Rule 10b–5 action also face the related but separate question of how to match individual transactions, usually choosing between two distinct accounting methods: 'first-in, first-out' (FIFO) and 'last-in, first-out' (LIFO)."). *See also Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F.Supp.2d 928, 938 (N.D.Ill.2010) ("[T]his Court holds that the fair and reasonable method for calculating damages in this class action is to apply FIFO for the method of matching purchases and sales while netting plaintiff's losses against any profits attributable to defendants' fraud.").

**75.** *In re AOL Time Warner, Inc.*, Nos. MDL 1500, 02 Civ. 5575, 2006 WL 903236, at *17 (S.D.N.Y. Apr. 6, 2006).

**76.** *Hunt v. Enzo Biochem, Inc.*, 530 F.Supp.2d 580, 590 n. 70 (S.D.N.Y.2008) (quotation marks and citation omitted).

**77.** *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y.2005). *Accord Jaffe*, 756 F.Supp.2d at 937 (stating that the major reason "why numerous courts have held that LIFO is the appropriate method for matching transactions in securities fraud cases is because it takes into account inflation related gains due to the fraud, and therefore, is a more accurate reflection of plaintiff's damages.").

**78.** *In re eSpeed*, 232 F.R.D. at 101 n. 36 (quotation marks and citation omitted). *Accord Jaffe*, 756 F.Supp.2d at 928 ("Under LIFO, sales of the defendant's stock during the class period are matched against the last shares purchased.").

**79.** *See* N.Y. CPLR § 211(b) ("A money judgment is presumed to be paid and satisfied after the expiration of twenty years from the time when the party recovering it was first entitled to enforce it.").

perwork, and submit the appropriate information to file their claims. Class Members have waited a very long time to recover. There is no need for further delay.

### D. Notice to Class Members; Summary Notice to Class Members; Proof of Claim Form

I have previously circulated edits to the Notice to Class Members and the Summary Notice to Class Members. The Proof of Claim form has not been revised. The Proof of Claim form properly seeks transaction data through November 11, 2002 to implement the PSLRA 90–day–lookback provision.

The Individual Defendants who were found not liable for any securities law violations, Jean–Marie Messier and Guillaume Hannezo, propose certain changes to the Notice and Summary Notice to Class Members. In short, the changes suggested by the Individual Defendants are intended to clarify certain aspects of the notice to be provided to Class Members. In particular, the Individual Defendants want to ensure that the Class Members fully understand that there is no recourse against them as they have been found not liable of any securities violations. I have adopted these suggestions in a more limited form.

### E. Shifting the Costs for Notice and Claims Administration Procedures

 Plaintiffs urge the Court to shift the costs of the post-verdict notice and the claims administration procedure onto Vivendi, who should arguably pay such costs as they are incurred. In support of the requested cost-shifting, plaintiffs state: " 'The cost of sending notice of relief *in a final judgment* in successful class litigation is a taxable cost payable by the losing defendant.' " [80] However, the Class Members do not have a final

judgment against Vivendi as individual reliance and damages have yet to be resolved.

Vivendi objects to this proposal. In its earlier memorandum, Vivendi noted that the costs of notice and claims processing are not taxable costs under Local Civil Rule 54.1(c).[81] Furthermore, the Supreme Court has twice held that the costs of notice and claims processing should not be shifted from class plaintiff onto defendant until defendant's liability has been conclusively determined.[82] The cases cited by plaintiffs in favor of cost-shifting involved situations in which all outstanding liability issues had been conclusively decided against the defendants. Accordingly, they are inapposite.

Although there is no final judgment, there is a final jury verdict, which has been upheld after a post-trial motion, conclusively establishing liability against Vivendi. Vivendi might indeed defeat some of the claims against it; however, there will eventually be a final judgment against Vivendi with respect to *some* of the class members. In this case, it is impossible to enter a final judgment before notice is distributed, because of defendants' right to challenge the reliance of individual claimants. That said, the efficient and fair course to handle payment for notice is to divide the cost evenly between plaintiffs and Vivendi, and then plaintiffs would have the right to move to recover the fifty percent at a later time. Accordingly, at this time I will order Vivendi to be responsible for half the cost of class notice, and Class counsel will bear the remainder of the cost.

## V. PREJUDGMENT INTEREST

### A. Applicable Law

 "In a suit to enforce a federal right, the question of whether or not to award prejudgment interest is ordinarily left

---

**80.** Pl. Notice Mem. at 7 (quoting H. Newberg, *Newberg on Class Actions* § 8.22 (4th ed. 2002)) (emphasis added).

**81.** *See* Vivendi Notice Opp. Mem. at 19.

**82.** *See Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 359, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) ("[W]e caution that courts must not stray too far from the principle ... that the represen-

tative plaintiff should bear all costs relating to the sending of notice because it is he who seeks to maintain the suit as a class action."); *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178–79, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("Where, as here, the relationship between the parties is truly adversary, the plaintiff must pay for the cost of notice as part of the ordinary burden of financing his own suit.").

to the discretion of the district court."[83] The Second Circuit has considered the following factors in determining whether to award prejudgment interest: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and (iv) such other general principles as are deemed relevant by the court."[84]

 The prejudgment interest rate is also within the court's discretion and "the same considerations that inform the court's decision whether or not to award interest at all should inform the court's choice of interest rate."[85] Likewise, the court has discretion to decide whether to compound interest and at what frequency to do so.[86]

### B. Prejudgment Interest Will Be Awarded

█ Plaintiffs argue that prejudgment interest is appropriate to compensate class members. *First,* prejudgment interest is necessary to fully compensate the class for their loss of use of the funds over the last ten years. *Second,* although wrongdoing by the defendant is not required, the fact that Vivendi acted with scienter shows that it is not inequitable to require Vivendi to pay prejudgment interest. *Third,* because Section 10(b) should be construed to effectuate its remedial purposes,[87] prejudgment interest is appropriate.

Defendants argue that prejudgment interest is inappropriate here. *First,* it would overcompensate plaintiffs by giving them a return on their investment they could not have obtained. The only thing plaintiffs have in common is their investment in a risky stock—Vivendi. Excluding the effects of the fraud, plaintiffs' Vivendi investments would not have produced a positive return. *Second,*

prejudgment interest would reward plaintiffs for improperly protracting a lengthy discovery period and punish defendants for exercising their right to a day in court. *Third,* prejudgment interest is inappropriate because the jury only found that Vivendi acted recklessly, rather than with malicious intent to defraud. *Fourth,* prejudgment interest would primarily benefit Class Counsel, because many of the class members are likely current shareholders as well. Thus, they would merely be paying interest to themselves, minus attorneys' fees. *Fifth,* prejudgment interest would be punitive because Vivendi never had use of plaintiffs' money.

Plaintiffs' request for prejudgment interest is granted, but not for the amount requested. Some measure of prejudgment interest is necessary to compensate plaintiffs. Plaintiffs have been deprived of the use of their funds for nearly ten years, and prejudgment interest is necessary to fully compensate them for their loss. *First,* Vivendi's argument that plaintiffs would be overcompensated has some merit. Indeed, at the April 2, 2012 conference, I expressed a concern about ensuring that plaintiffs will not receive a windfall. However, this concern is properly directed to the *amount* of prejudgment interest, not its availability. Plaintiffs deserve some measure of compensation for being deprived of the use of their funds for such an extended period of time.

*Second,* both parties were partially responsible for delay over the course of this extensive litigation, and such a consideration should impact the rate of interest, not its availability. *Third,* although scienter is not necessary to award interest, because the focus is on compensating plaintiffs, Vivendi's recklessness does not weigh against an award of interest. *Fourth,* while Vivendi raises a novel argument that prejudgment interest merely benefits Class Counsel, as

83. *Gierlinger v. Gleason,* 160 F.3d 858, 873 (2d Cir.1998).

84. *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1476 (2d Cir.1996).

85. *Jones v. UNUM Life Ins. Co. of Am.,* 223 F.3d 130, 139 (2d Cir.2000).

86. *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.,* No. 04 Civ. 2293, 2009 WL 5185808, at *10 (E.D.N.Y. Dec. 23, 2009) (declining to compound prejudgment interest even though the IRS underpayment rate is typically compounded).

87. *See First Jersey Sec., Inc.,* 101 F.3d at 1466.

plaintiffs are mainly paying themselves minus attorney' fees, there is no evidence to support a finding that most Class Members are currently shareholders. *Fifth*, Vivendi's argument that it never had use of plaintiffs' money is irrelevant, because the prejudgment interest inquiry focuses on compensating plaintiffs, not disgorging inequitable gains from defendants. Accordingly, an award of prejudgment interest is appropriate in this case.

### C. Prejudgment Interest Will Be Calculated Based on the Yield of a One–Year Treasury Note Compounded Annually Starting August 14, 2002

■ Plaintiffs argue that the Court should use the IRS large corporate underpayment rate ("IRS rate"), which the Second Circuit has approved of in SEC enforcement actions. The IRS rate is compounded daily.[88] In addition, plaintiffs request that interest be calculated from August 14, 2002, the last day of the class period because the calculation of interest based on the last day of the class period has been held to be fair and appropriate.[89] This calculation results in prejudgment interest of 81 cents per each dollar of damages for the period August 14, 2002 to March 31, 2010.

Defendants argue that the IRS rate is punitive and that if prejudgment interest is awarded, it should be calculated according to the average annual rate of return on one-year Treasury bills, resulting in prejudgment interest of 19 cents to the dollar (with no compounding) or 21 cents to the dollar (with annual compounding). The Second Circuit has held that prejudgment interest "generally should be measured by interest on short-term, risk-free obligations."[90] Courts have also held that the measure for post-judgment interest, the average rate of return on one-year Treasury bills,[91] is an appropriate starting point for considering the prejudgment interest rate.[92] In contrast, the IRS rate requested by plaintiffs has never been used in a private federal securities action under Section 10(b). Rather, the IRS rate has been used in SEC enforcement actions for disgorgement. The IRS rate is intentionally punitive to discourage taxpayers from using the government as an involuntary banker by deferring payment of taxes. Although defendants argue that interest should not be compounded, if the court does compound interest, defendants request that it be compounded annually.[93]

In their reply papers, plaintiffs argue that applying the Treasury rate is inappropriate, because plaintiffs were pursuing risky investments, not an investment generating a low or risk-free return.[94] Plaintiffs also argue that defendants' argument that Vivendi did not have use of the money is irrelevant and misplaced, because Vivendi did borrow against its treasury shares, the value of which were inflated by Vivendi's fraud. Finally, plaintiffs raise an alternative measure of prejudgment interest for the first time in their reply brief—fusing the 9% New York statutory rate (not compounded), which results in 69 cents of prejudgment interest per dollar of damages as of March 31, 2010.[95]

---

**88.** *See* 26 U.S.C. § 6622; I.R.S. Revenue Ruling 1009–37.

**89.** *See, e.g., United States v. Seaboard Sur. Co.,* 817 F.2d 956, 966–67 (2d Cir.1987).

**90.** *New York Marine & Gen. Ins. Co. v. Tradeline (LLC),* 266 F.3d 112, 131 (2d Cir.2001) (quotations omitted).

**91.** *See* 28 U.S.C. § 1961.

**92.** *See Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 314 F.Supp.2d 201, 204–05 (S.D.N.Y.2003) ("For purposes of assigning a prejudgment interest rate, the presumption is that plaintiff invested those funds in United States Treasury bills with a 52–week maturity. That is the presumption Congress made when calculating interest rates that should apply to post-judgment interest ... and there is no reason a different presumption should apply here. United States Treasury bills are a conservative yet valid investment option, and reflect a realistic rate of interest that plaintiff could have received.").

**93.** *See* 28 U.S.C. § 1961 (interest calculated according to Treasury bill rate is compounded annually).

**94.** *See* Plaintiffs' Reply Memorandum in Support of Their Motion for Award of Prejudgment Interest at 6–10.

At the April 2, 2012 conference I voiced my primary concern with awarding prejudgment interest. In order to not provide plaintiffs with a windfall, I requested further briefing on how risky a stock Vivendi was during the class period and how likely was it that an investor in Vivendi would have invested in a different security that would have provided a positive return over the past decade.[96]

Vivendi is correct that plaintiffs would be overcompensated by an award using the IRS rate. While I am not convinced that plaintiffs would still have invested in Vivendi had its liquidity condition been disclosed, it is likely that they would have pursued an equally risky investment. Plaintiffs use the fact that plaintiffs were risky investors to argue for prejudgment interest exceeding 81 cents per each dollar of damages. This is highly speculative and would grossly overcompensate plaintiffs. Just as an investment in Vivendi, exclusive of the effects of the fraud, would have resulted in a substantial loss during the Class period,[97] I cannot conclude that plaintiffs, by investing in equally risky investments, would have received a 81% return over a decade, especially in light of the turmoil in the financial markets.

Indeed, plaintiffs make much of the fact that Vivendi was one of the largest firms of the CAC–40, "the main benchmark index of blue chip stocks listed on the Paris Bourse." [98] However, in plaintiffs' unsolicited expert declaration on this topic, Dr. Blaine Nye considers the returns over the past decade on Vivendi ordinary shares, the Dow Jones Industrial Average, the S & P 500, the Fidelity Magellan Fund, and the Dow Jones Euro STOXX Media Index,[99] but ignores the most on point comparison for what an investor in Vivendi might have alternatively invested in, had she not invested in Vivendi—an index fund for the CAC–40.[100] Because plaintiffs would likely have not received a significant return on their investments, any award above the presumptive rate, based on the yield of a one-year treasury note, would be speculative and result in a windfall for plaintiffs. Accordingly, plaintiffs are awarded prejudgment interest based on the yield of a one-year treasury note compounded annually starting August 14, 2002.

## VI. ATTORNEYS' FEES AND COSTS

Federal Rule of Civil Procedure 23(h)(1) requires that notice of a motion for attor-

**95.** *See* CPLR § 5004; *SEC v. Musella*, 748 F.Supp. 1028, 1043 (S.D.N.Y.1989) ("A district court sitting in New York may use the rate of interest used to calculate prejudgment interest under New York law in calculating prejudgment interest in federal securities law cases."), *aff'd*, 898 F.2d 138 (2d Cir.1990).

**96.** *See* 4/2/12 Tr. at 44:4–21.

**97.** *See* Vivendi, S.A.'s Memorandum of Law in Opposition to Plaintiffs' Motion for an Award of Prejudgment Interest at 4 ("[A] shareholder who bought a share in Vivendi Universal on December 12, 2001, at the closing price of € 57.50, when, according to the jury's verdict, inflation reached its maximum, would have overpaid by € 11.00. If he then sold that share on August 14, 2002, at the closing price of € 11.89, when, according to the jury's verdict, inflation was zero, he would have lost € 34.61, even after the € 11.00 of inflation is excluded. The question arises, therefore, as to what that shareholder would have done with the € 11.00 had Vivendi's share price been cheaper (*i.e.*, not inflated). If he had put that € 11.00 in Vivendi stock over the same period … it would have been worth € 2.81 because from December 12, 2001, to August 14,

2002, Vivendi Universal shares declined 74.4% excluding the impact of inflation.").

**98.** Plaintiffs' Supplemental Memorandum in Support of Motion for Award of Prejudgment Interest at 3.

**99.** *See* 4/25/12 Declaration of Dr. Blaine F. Nye in Support of Plaintiffs' Motion for an Award of Prejudgment Interest. Because defendants did not have an opportunity to depose Dr. Nye or obtain any discovery about this unsolicited expert declaration, it forms no basis for my opinion. I note that Dr. Nye's choice of August 16, 2002 instead of August 14, 2002 for purposes of his calculations is problematic and drastically alters his calculations.

**100.** *Compare Vivendi Woes Hit Europe Bourses*, CNN.com Europe (Aug. 14, 2002) ("Paris' CAC 40 index slumped … to 3,240.81."), *available at* http://europe.cnn.com/2002/BUSINESS/08/14/markets.europe/index.html, *with CAC 40 Index Quote*, Bloomberg, http://www.bloomberg.com/quote/CAC:IND (noting that the CAC–40 closed at 3,240.20 on July 2, 2012 after increasing from 3,012.71 on June 26, 2012).

neys' fees and costs "must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Vivendi argues that because plaintiffs have not yet filed a motion for attorneys' fees and costs, notice of such to the class members is unwarranted at this time. Vivendi's position would require an additional notice to Class Members once the plaintiffs file a motion for attorneys' fees and costs. This would be wasteful. Indeed, notice of a request for fees and costs is often circulated before a formal motion is made. Accordingly, the Notice to Class Members will contain information regarding attorneys' fees, but it has been pared down considerably.

## VII. CONCLUSION

For the foregoing reasons, plaintiffs' motion for adjustment of class definition is denied; plaintiffs' motion to approve plaintiffs' proposed procedures for the "Individual Reliance Phase" is granted in part and denied in part; plaintiffs' motion to approve post-verdict class notice and claims administration and to require Vivendi to pay for those procedures is granted in part and denied in part; plaintiffs' renewed motion for award of prejudgment interest is granted, but not for the amount requested; and plaintiffs' motion regarding plaintiffs' application for attorneys' fees and costs is granted. The Clerk of the Court is directed to close these motions [Docket Nos. 1100 and 1126]. A status conference is scheduled for July 17, 2012 at 3:00 p.m. in Courtroom 15C.

SO ORDERED: